IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jinan Chehade,

          Plaintiff,

     v.

Foley & Lardner, LLP,

          Defendant.

Civil Action No. 1:24-cv-04414

## COMPLAINT

The plaintiff, Jinan Chehade ("Plaintiff" or "Chehade"), by and through undersigned counsel, brings claims against the defendant, Foley & Lardner, LLP, ("Defendant" or "Foley") for associational discrimination, discrimination on the basis of religion and national origin, and promissory estoppel, and in support of those claims, states as follows:

### PARTIES

1. Plaintiff is an attorney currently residing in Palos Hills, Illinois. Foley hired her to work as an associate at Foley's Chicago office but terminated her the day before her start date.

2. Foley is Limited Liability Partnership headquartered in Wisconsin and registered to do business in the State of Illinois. Foley has over 1,100 attorneys in 25 offices worldwide.

### JURISDICTION AND VENUE

3. This Court's jurisdiction over the subject matter of this action is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

4. Venue is proper under 28 U.S.C.§ 1391(b) because Defendant is located in the Northern District of Illinois and the unlawful employment practices alleged herein took place in this district.

1

5. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about November 13, 2023, alleging discrimination and retaliation.

6. The EEOC issued a Notice of Right to Sue on April 8, 2024.

7. Plaintiff's Charge was cross-filed with the Illinois Department of Human Rights ("IDHR").

8. Within 30 days of the EEOC's issuance of the Notice of Right to Sue, Plaintiff provided a copy of the EEOC's Notice of Right to Sue to the IDHR and requested that the IDHR adopt the EEOC's findings in this case.

9. On May 3, 2024, the IDHR issued a Notice of Dismissal and Closure.

**FACTS COMMON TO ALL CLAIMS**

**Background and Summary**

10. Chehade earned her undergraduate degree at DePaul University in 2020 and her law degree at Georgetown University in 2023. She was admitted to the Illinois bar in December of 2023.

11. Chehade is a Muslim Arab woman who has long been active in her community. At DePaul, she was President of the Muslim Student Association, and at Georgetown Law, she was Co-President of the Muslim Law Student Association ("MLSA"). Consistent with those roles, Chehade has a history of advocacy for Palestinian rights, an issue which is not only a matter of justice but personal for her, as she has family and friends in Gaza and Lebanon. In that regard, Chehade also had leadership roles in Students for Justice in Palestine ("SJP") at DePaul and Georgetown.

12. On July 29, 2022, during a summer clerkship at Foley prior to her third year of law school, Foley offered Chehade a full-time associate position at its Chicago office starting in the fall of 2023, which she accepted. Chehade looked forward to beginning her first job as an attorney at Foley, and helping to support her family as a first-generation American. She rented an apartment downtown

near Foley's office, purchased appropriate business attire, and prepared for her October 23, 2023 start date.

13. Chehade accepted an offer from Foley only after Foley personally assured her that it embraced her identity, heritage, and beliefs as an Arab Muslim. Chehade's support for the human and national rights of Palestinians are central to her cultural identity.

14. Yet it was that very identity which prompted Foley management, on October 22, 2023, to (1) interrogate Chehade about her beliefs, her prior association with Students for Justice in Palestine, and her community ties, including her father's employment position at a local mosque, and (2) fire her on a Sunday evening, just 15 hours before she was scheduled to start her first day of work as an attorney.

15. By contrast, Foley did not terminate the employment of Foley attorneys who openly supported Israeli violence against Palestinians. Unlike Chehade, they were not expressing Arab identity or solidarity and did not associate with Palestinians.

### Foley's Purported Commitment to Diversity and Assurances to Chehade

16. For years, many clients of Foley and other large law firms have expected and demanded that their law firms be diverse in terms of women and ethnic minority attorneys.

17. Accordingly, Foley has sought to enhance its attractiveness to top minority law students and existing and potential clients by touting its purported commitment to diversity and inclusion. Foley has broadcast this message through its website and other advertising and marketing materials, including press releases. As then Foley Chairman and CEO Jay Rothman declared in 2021:

> At Foley, we believe our firm should reflect the diverse world we serve. People from different backgrounds challenge each other, foster greater creativity, and uncover new and better ways of doing business. We will continue to call on our attorneys, professional staff and clients to help us foster an environment that fully reflects and embraces the rich cultural heritage of the communities where we practice law.

Foley has attempted to boost its ranking in The American Lawyer's "Diversity Scorecard" by making a particular effort to hire attorneys who are what it labels "women of color." In June of 2022, Foley boasted that it had increased its ranking on the Diversity Scorecard by 31 spots.

18. Foley's Chief Diversity and Inclusion Partner described Foley's alleged commitment to diversity as allowing attorneys to bring their "authentic self" to the workplace:

> We are striving to be a community where everyone can reach their full potential. We are relentlessly focused on creating a workplace where everyone can bring their authentic self regardless of ethnicity, background, belief, orientation, gender expression, or personal need.

19. Foley's current Chairman and CEO Daljit Doogal stressed the firm's commitment to not just hiring, but retaining, diverse associates in his 2022 statement on Foley's website:

> In terms of ensuring Foley's diverse pipeline going forward, Doogal said, "We have been and we're continuing to be more focused on monitoring that pipeline along with [our] recruiting efforts," but "it's also about retaining [diverse associates and business professionals] and providing those leadership opportunities and providing them leadership training."

(bracketed in original).

20. To demonstrate its purported commitment to diversity and inclusion, in [insert approximate date] Foley hired a Director of Diversity and Inclusion, Alexis Robertson, to coordinate its diversity and inclusion efforts firm wide, and to assure diverse recruits and associates that Foley's commitment to diversity is real. As Robertson declared: "Foley is committed to the success of our talent. Ensuring success requires us to weave diversity, equity, and inclusion into the fabric of the firm …." Foley management authorized and encouraged Robertson to speak for the firm on issues of diversity and inclusion.

21. Foley aggressively markets its purported commitment to diversity in its recruiting pitch to law students. In addition, to the messaging quoted above, Foley touts its creation of "affinity groups" for diverse attorneys:

4

> We recognize the importance of providing our diverse talent with community-building and networking opportunities. We have national affinity groups for women, ethnic minorities, members of the LGBTQ community, and veterans. These groups help reinforce a sense of community, provide collaborative business development opportunities, and participate in mentoring and recruiting activities. The firm's affinity groups serve as a catalyst to promote inclusion, build community, and provide leadership opportunities for diverse attorneys within the firm. The groups meet regularly, setting their own agendas tailored to the needs of their members.

22. While applying for jobs, Chehade was impressed by Foley's professed commitment to diversity, including to retaining diverse associates.

23. However, Chehade wanted to make sure that Foley's commitment extended to her as well, as a Muslim Arab woman active in her community. Chehade was aware of only one other visibly Muslim Arab woman attorney at Foley out of over 1,100 attorneys. In their recruiting and marketing materials, Robertson and Foley discussed the importance of such groups as the Black Law Student Association, the National Bar Association, and LGBTQ groups in website posts directed to recruiting, but Chehade could find no mention of the MLSA.

24. Indeed, Chehade could find no reference to the words "Muslim" or "Arab" in any of Foley's recruiting materials. In addition, Foley's "affinity group" applicable to Chehade is the group is titled "Asian, Pacific and Middle Eastern Attorneys Affinity Group," a seemingly "all of the rest" grouping comprised of people of dramatically different heritages and concerns and corresponding with a geographic region that is comprised of more than 5 billion people. Therefore, Chehade had concerns over whether she was being recruited so that boxes could be checked on Foley's Diversity scorecard, and hence meet various clients' diversity quotas, without any real commitment to diversity or the inclusion and retention of Muslim and/or Arab attorneys.

25. Foley DEI Director Robertson had written that Foley had allowed a female attorney of Gullah heritage "to be her authentic self." In February of 2023, Robertson also published an article titled "Foley & Lardner: You are Not Diverse (and Neither of Us are Either)" which she co-authored with Foley's Manager of Diversity and Inclusion, Dan Sharpe, in which they declared: "It

is only by saying what we actually mean that we can begin to address, the multitude of issues stemming from *the unique histories of disparate groups* typically lumped together under the umbrella of 'diversity.'" (emphasis added).

26. Chehade found Robertson's statements encouraging, but she wanted reassurance from Robertson that Foley would embrace Chehade's own "unique history" as an Arab Muslim woman. In July 2023, while a Foley summer associate, Chehade met with Robertson over lunch to discuss her experience as a first-generation Muslim Arab woman and her concerns as to whether Foley would support her "authentic self." Robertson promised Chehade that Foley indeed valued and supported Chehade's Arab Muslim heritage and perspective and embraced her history and values.

27. Robertson's assurances to Chehade were critical in her decision to accept Foley's July 29, 2023 offer of an associate position. As a result, and in reasonable reliance upon these promises, she accepted the position and did not pursue other available job opportunities. Chehade's scheduled start date was October 23, 2023. In a few short months, Chehade would learn that Robertson's assurances were a sham.

28. On October 21, 2023, Lisa Noller, Foley Partner and Chair of Litigation, asked Chehade to attend a meeting on October 22, 2023; the purpose of the meeting was to discuss, to quote Noller, "what you've been doing on social media." Immediately, Chehade reached out by email to Robertson for guidance and support. Robertson never responded; in modern parlance, Foley's DEI Director deliberately "ghosted" Chehade in her hour of greatest need, at the expense of the very diversity for whose promotion she had been hired.

29. Thereafter, Foley CEO Doogal, the purported champion of hiring and retaining diverse associates, directed the firing of Chehade.

6

**The Context of Foley's Firing of Chehade**

30. On October 7, 2023, scores of Hamas gunmen broke through the wall bordering Gaza and Israel and swept into towns, military bases and a music festival near the border of Gaza. During Hamas's attack, more than 1,160 people were killed, including approximately 767 civilians, and Hamas took more than 250 people hostage.

31. Following the Hamas attack, starting on October 8, 2023, Israel launched a massive military offensive on Gaza's people and civilian infrastructure with the express purpose of collective punishment; as IDF spokesperson Rear Admiral Daniel Hagari admitted on October 10, "the emphasis is on damage and not on accuracy."[1] On October 9, Israeli Defense Minister Yoav Gallant announced "a complete siege" on Gaza, adding, "There will be no electricity, no food, no fuel, everything is closed. . . . We are fighting human animals and we are acting accordingly."[2]

32. Similar vows were made in the following days, weeks and months: In its December 28, 2023 petition before the International Court of Justice, the government of South Africa detailed nine pages of examples of statements from Israeli officials since October 7, including:

a.  Israeli Knesset ('MKs') have repeatedly called for Gaza to be "wiped out", "flatten[ed]", "eras[ed]", and "[c]rush[ed] . . . on all its inhabitants."

b.  The Israeli Minister of Agriculture "recalled the [ethnic cleansing] of 1948, in which over 80 percent of the Palestinian population of the new Israeli State was forced from or fled their homes, stating that **'[w]e are now actually rolling out the Gaza Nakba'.**"

---

[1] Bethan McKernan & Quique Kierszenbaum, *'We're focused on maximum damage': ground offensive into Gaza seems imminent*, the Guardian, October 10, 2023, *available at* https://www.theguardian.com/world/2023/oct/10/right-now-it-is-one-day-at-a-time-life-on-israels-frontline-with-gaza.

[2] Emanuel Fabian, *Defense minister announces 'complete siege' of Gaza: No power, food or fuel*, the Times of Israel, October 9, 2023, *available at* https://www.timesofisrael.com/liveblog_entry/defense-minister-announces-complete-siege-of-gaza-no-power-food-or-fuel/.

7

    c.   On 13 October 2023, Israel's Minister of Energy and Infrastructure said: "All the civilian population in [G]aza is ordered to leave immediately. We will win. They will not receive a drop of water or a single battery until they leave the world."[3]

33. Quickly thereafter, people who protested Israel's indiscriminate bombing of civilians in Gaza were labeled "antisemitic." The government of Israel itself reportedly participated in this campaign; according to the Israeli website YNet news, "the Foreign and the Diaspora Affairs ministries have formulated an action plan aimed at inflicting economic and employment consequences" on what the website refers to as "antisemitic students."[4] YNet went on to report that this plan has already been implemented at "major law firms in the U.S."[5]

34. Chehade, a long-time supporter of Palestinian human rights, spoke out about Israel's indiscriminate bombing of civilians of Gaza at an October 11, 2023 meeting at City Hall and through posts on her personal social media account.

### Foley's Investigation and Interrogation of Chehade

35. Unbeknownst to Chehade, Foley began investigating her background and social media posts. On information and belief, by Friday, October 20, 2023, Foley had developed a plan to terminate Chehade before she officially started her position on Monday, October 23, 2023. On information and belief, Foley management, including DEI Director Robertson, were participants in crafting that plan.

36. Foley had earlier lost a discrimination case brought by a Muslim associate fired by the Chicago Office in the wake of 9/11 and his articles about Islam (*Hasan v. Foley*, 552 F.3d 520 (7th Cir. 2008)). Accordingly, upon information and belief, Foley wanted to engage in the pretense of

---

[3] Republic of South Africa, *APPLICATION INSTITUTING PROCEEDINGS*, International Court of Justice, December 28, 2023, available at https://www.icj-cij.org/sites/default/files/case-related/192/192-20231228-app-01-00-en.pdf
[4] Itamar Eichner, *Shaming and pressuring donors: Israel's strategy against antisemitism on US campuses*, Ynetnews, November 25, 2023, available at https://www.ynetnews.com/article/rk5ppryht
[5] *Id*.

allowing Chehade to give her side of the story in a Sunday afternoon "interview" before firing her. That charade would also allow Foley to point to Chehade's answers to the scripted "interview" as the pretext for firing her if she said the wrong thing.

37. On Saturday, October 21, 2023, Lisa Noller, Foley's Chair of Litigation, called Chehade and asked her to attend a meeting on October 22, 2023, stating: "We've seen what you've been doing on social media and need you to come into office for a meeting tomorrow at 1:00."

38. When Chehade arrived at the Sunday, October 22, 2023 meeting, Noller and Frank Pasquesi, the Managing Partner of the Chicago office, met her in the lobby of Foley's conference room floor.

39. Noller and Pasquesi proceeded to interrogate Chehade in a hostile manner about her student activism, her community associations, her October 11, 2023 remarks at a Chicago City Hall meeting, and her post on her personal social media page which contextualized Hamas's attack in Israel's longtime violent occupation and colonization of Palestine, and the Palestinian struggle for freedom.

40. Noller and Pasquesi claimed Foley happened across Chehade's social media posts because the office was looking for a picture of her to put on the website directory. That explanation was false; Foley had already requested a photo directly from Chehade for its website, and she had provided it by the deadline provided.

41. During the interrogation, Noller and Pasquesi questioned Chehade extensively about her previous leadership role in Students for Justice in Palestine ("SJP"), a student organization with branches all over the country with a long history of civil and nonviolent advocacy for "justice, human rights, liberation, and self-determination for the Palestinian people."

42. Though Chehade informed Noller and Pasquesi that she was no longer involved with SJP, they grilled her about what they claimed was the language of alleged SJP social media posts which she played no role in drafting.

43. Specifically, Noller alleged that SJP had used the phrase "by any means necessary" and made posts "endorsing terrorism." Chehade explained that she was not aware of such posts by SJP, and that she had graduated and was therefore no longer a member of SJP. She suggested to Noller and Pasquesi that if they had questions about SJP's intentions, they could ask SJP directly. Noller replied that Chehade was not answering her questions. Chehade reiterated that she did not know what social media posts they were referring to, and confirmed she was no longer affiliated with SJP and had no role in crafting the social media posts Noller was asking her about.

44. Noller and Pasquesi also questioned Chehade about her speech at City Hall, in which she spoke in opposition to a resolution which condemned the Hamas attack but completely absolved Israel of any responsibility for the deaths of what, at that time, amounted to more than double the number of people killed during the Hamas attack. Chehade stated that she spoke as a concerned citizen with family and friends whose lives were at stake in Gaza and Lebanon.

45. Noller and Pasquesi asked Chehade about a statement she made during her speech in which she said that the Hamas attack was not "unprovoked" (contrary to what Israeli President Herzog and White House National Security Council spokesperson Adrienne Watson had claimed), but rather the "natural result of 75 years of occupation and violence by Israeli forces." Noller and Pasquesi asked Chehade what she meant by that, and she explained that she was providing historical and political context, and that the Israeli-Palestinian conflict could not be resolved without understanding that context.

46. Pasquesi also asked Chehade why she did not condemn Hamas in her speech. Chehade explained that her focus on social media was on what was happening in Gaza and her fear for her family and friends. The Israeli perspective, as well as the concern over the Israeli civilians who were killed on October 7, were already all over the mainstream media and were the focus of the six speakers who preceded her at the City Council hearing. Chehade's focus and aim was the protection

of the more than two million people in Gaza who were under ongoing bombardment and the provision of context that was missing from mainstream narratives.

47. Chehade also explained to Foley that she in no way endorsed the targeting of civilians. Pasquesi also asked whether Chehade "condemn[ed] Hamas and the October 7 attacks," to which she responded that yes, she condemns any loss of human life.

48. Pasquesi asked Chehade why she did not condemn Hamas in her speech before City Hall. Chehade responded that racial and religious stereotypes have resulted in an atmosphere in which Muslims and Arabs are always expected to apologize for or denounce terrorist attacks they had no involvement in, whereas no one asks Israelis to denounce Israel's crimes against civilians.

49. Noller and Pasquesi also quizzed Chehade about her "role in the community" and the workplace of her father, who serves as Communications Director of Mosque Foundation in Bridgeview, Illinois, one of the largest mosques in the United States.

50. Chehade asked Noller and Pasquesi if they monitored the personal opinions of other attorneys in this manner. They responded, "We don't censor people except if it's terrorism and inciting violence." They said Foley "value[s] diversity" and they do not want to make other associates feel unwelcome by someone's personal views. At no time was Chehade ever advocating "terrorism and inciting violence," and she made that quite clear during the interrogation.

51. That evening, Pasquesi informed Chehade that her employment offer was revoked. Pasquesi said he would follow up with an email explanation. However, neither Mr. Pasquesi nor anyone else at Foley followed up with that email explanation, likely because Foley could not point to anything Chehade said during the interrogation as a basis for firing her.

52. Foley's termination of Chehade's employment caused her great disappointment, emotional distress, loss of past and future earnings, and financial hardship.

**Foley's Double Standard**

53. On information and belief, Chehade was the only attorney whose social media posts Foley searched in the weeks following October 7, 2023.

54. On information and belief, Chehade was the only attorney Foley interrogated about past membership in student advocacy groups.

55. On information and belief, Chehade was the only attorney Foley interrogated about their role in "the community" and their parents' role in a religious institution.

56. Contrary to its professed commitment to nonviolence, Foley does not investigate or censor attorneys who condone violence against Palestinians.

57. Several Foley partners openly and publicly support the actions of Israel towards Palestinians in Gaza, even though such actions have caused civilian deaths by the tens of thousands, the restriction of entry of humanitarian aid into Gaza as children are starving, and the detention of thousands of Palestinians without charge or trial. For example:

    a. Chicago office Foley partner Max Chester posted a video on the website LinkedIn in which the speaker advocated for deporting anyone in the United Kingdom holding a Hamas flag, saying they should be "sent to the Gaza and try your luck there."

    b. Foley partner Dovi Adlerstein publicly shared on LinkedIn a post he described as "well said," which stated, in part, [I]f you're focused on the people of Gaza right now, you're either ignorant or intentionally hypocritical. . . . The Palestinian people elected Hamas. Make up your mind. If there are people who you believe deserve a state then it's time you held them accountable as a people." The post made clear that holding the Palestinian people "accountable" means killing them; it said people should either "stand with Israel while we cleanse the world of Hamas savages or you can go ahead and keep your mouth shut . . . ." It also rejected claims that the number

12

of civilians Israel was killing in Gaza was disproportionate. The post also called for the relocation of Gaza's entire population: "They have nowhere to go those poor Gazans? Why don't you look at a map? They have a border with Egypt. Let them take them in if they care so much."

c. For more than seven months, Chicago office Foley partner Michael Kasdin has maintained a "STAND WITH ISRAEL" photo published by the American Jewish Committee (AJC) on his Facebook profile. The AJC has repeatedly justified Israel's indiscriminate killing of Palestinian civilians. The AJC also approvingly labeled the Israeli terrorist organization Haganah as "a Jewish paramilitary organization that played a significant role in the defense of Jewish communities in British Mandate Palestine." As part of Plan Dalet, a campaign to ethnically cleanse Palestine, the Haganah committed several terrorist attacks, such as the 1947 massacre in the village of Balad al-Sheikh, in which the Haganah bombed houses and pulled all the men out of their houses and shot them, eventually succeeding in its goal of depopulating that village.

58. On information and belief, Foley management has been aware of these and similar social media posts and communications, none of which has resulted in employment termination.

**Count I**
**Discrimination on the Basis of Ethnicity, Religion, and Association**
**Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1)**
**Illinois Human Rights Act ("IHRA"), 775 ILCS 5 §§ 1-102, 2-102**

59. Each paragraph of this Complaint is incorporated as if fully restated herein.

60. In deciding to terminate Plaintiff's employment, Foley relied on stereotypes about Arabs, Muslims and Palestinians as inherently violent and anti-Jewish.

61. Foley terminated the employment of Chehade purportedly for ignoring or excusing the killing of Israelis while it tolerated employee speech that called for or excused the mass slaughter of a far greater number of Palestinians.

62. Foley's discriminatory application of its claimed workplace policies and values illustrates a failure to view Israeli and Palestinian lives as having equal worth.

63. Foley's discriminatory application of its claimed workplace policies and values reflects anti-Palestinian racism.

64. Foley's claim to have censored Plaintiff because of her advocacy for "terrorism and inciting violence" is pretext for its anti-Palestinian racism.

65. Foley imposed different standards on its non-Arab, non-Muslim employees who did not have strong associations with Palestinians in determining whether they would make others feel "unwelcome because of their personal views," and therefore were fit for termination.

66. Plaintiff's Arab ethnicity, her Muslim faith and affiliations, and her association with Palestinians as well as with organizations seeking to promote the interests of Palestinians were motivating factors in Foley's decision to terminate her employment.

**Count II**
**Promissory Estoppel**

67. Foley's personal assurances to Chehade in July 2023 constituted an unambiguous promise that, at a minimum, her heritage, beliefs and associations as an Arab Muslim known to be active in her community would not be held against her ("We embrace your heritage, history and values," etc.).

68. Yet that is precisely what happened: Foley investigated Chehade's social media posts, and it interrogated her about her beliefs, the meaning of SJP posts she had nothing to do with, her advocacy for an Arab population under bombardment, her ties in the Arab and Muslim communities, and even her father's ties to a community mosque. Worse, even before the interrogation, Chehade reached out to Foley DEI Director Robertson for support and guidance. Robertson, however, went radio silent.

69. Chehade reasonably relied on Foley's assurances in accepting the position, as Foley expected and hoped that she would.

70. Chehade reasonably relied on Foley's assurances to her detriment by accepting Foley's offer and eschewing other employment opportunities.

**Request for Relief**

WHEREFORE, Plaintiff respectfully requests:

- All wages Plaintiff would have received if Foley had not terminated Chehade's employment;

- Prejudgment interest;

- Compensation for emotional distress;

- Punitive damages;

- Attorneys' fees and costs; and

- Such other relief as law and justice allow.

**JURY DEMAND**

Plaintiff requests a trial by jury with respect to any issues so triable.

DATED: May 29, 2024

Respectfully submitted,

*/s/ Rima Kapitan*

Rima Kapitan (rima@kapitangomaa.com)
Atty No. 6286541
Kapitan Gomaa Law, P.C.
P.O. Box 46503
Chicago, Illinois 60646
(312)566-9590

*/s/ Paul Vickrey*
Paul K. Vickrey (vickrey@vvnlaw.com)
Patrick F. Solon (solon@vvnlaw.com)
Dylan M. Brown (dbrown@vvnlaw.com)
Vitale, Vickrey, Niro, Solon & Gasey LLP
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
(312) 236-0733

**Attorneys for Jinan Chehade**