**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JINAN CHEHADE, | Case No. 1:24-cv-04414 |
| Plaintiff, | |
| v. | Judge Sharon Coleman |
| FOLEY & LARDNER, LLP, | Magistrate Judge Holleb Hotaling |
| Defendant. | |

**FOLEY & LARDNER LLP'S ANSWER TO PLAINTIFF'S
AMENDED COMPLAINT AND AFFIRMATIVE AND OTHER DEFENSES**

Foley & Lardner LLP ("Defendant" or "Foley"), by and through its attorneys and

pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure, hereby partially answers[1]

Plaintiff's Amended Complaint and asserts its affirmative and other defenses as follows:

**PARTIES**

**COMPLAINT ¶1:**

Plaintiff is an attorney currently residing in Palos Hills, Illinois. Foley hired her to work
as an associate at Foley's Chicago office but terminated her the day before her start date.

**ANSWER:**

Upon information and belief, Defendant admits Plaintiff is an attorney currently residing

in Palos Hills, IL. Answering further, Defendant admits it extended an offer to Plaintiff to be an

associate but then rescinded the offer. Defendant denies all remaining allegations in Paragraph

1.

---

[1] Defendant also filed a partial Motion to Dismiss and accompanying Memorandum of Law as to Count II of
Plaintiff's Complaint.

**COMPLAINT ¶2:**

Foley is Limited Liability Partnership headquartered in Wisconsin and registered to do business in the State of Illinois. Foley has over 1,100 attorneys in 25 offices worldwide.

**ANSWER:**

Defendant admits the allegations in Paragraph 2.

## JURISDICTION AND VENUE

**COMPLAINT ¶3:**

This Court's jurisdiction over the subject matter of this action is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

**ANSWER:**

Defendant admits that this Court has subject matter jurisdiction over Plaintiff's claims in this lawsuit and specifically denies any wrongdoing or violation of law and denies that Plaintiff is entitled to the relief sought or any relief whatsoever.

**COMPLAINT ¶4:**

Venue is proper under 28 U.S.C.§ 1391(b) because Defendant is located in the Northern District of Illinois and the unlawful employment practices alleged herein took place in this district.

**ANSWER:**

Defendant admits that venue is proper in this Court and specifically denies any wrongdoing or violation of any law and denies that Plaintiff is entitled to the relief sought or any relief whatsoever.

**COMPLAINT ¶5:**

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about November 13, 2023, alleging discrimination and retaliation.

**ANSWER:**

Defendant admits Plaintiff filed a charge of discrimination with the EEOC and denies any wrongdoing or violation of law. Answering further, Defendant is without information sufficient to form a belief as to when the charge was filed and denies the allegation on that basis.

**COMPLAINT ¶6:**

The EEOC issued a Notice of Right to Sue on April 8, 2024.

**ANSWER:**

Defendant admits the allegations in Paragraph 6.

**COMPLAINT ¶7:**

Plaintiff's Charge was cross-filed with the Illinois Department of Human Rights ("IDHR").

**ANSWER:**

Defendant admits the allegations in Paragraph 7.

**COMPLAINT ¶8:**

Within 30 days of the EEOC's issuance of the Notice of Right to Sue, Plaintiff provided a copy of the EEOC's Notice of Right to Sue to the IDHR and requested that the IDHR adopt the EEOC's findings in this case.

**ANSWER:**

Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in Paragraph 8.

**COMPLAINT ¶9:**

On May 3, 2024, the IDHR issued a Notice of Dismissal and Closure.

**ANSWER:**

Defendant admits the allegations in Paragraph 9.

## ALLEGED FACTS COMMON TO ALL CLAIMS

### Alleged Background and Summary

**COMPLAINT ¶10:**

Chehade earned her undergraduate degree at DePaul University ("DePaul") in 2020 and her law degree at Georgetown University ("Georgetown") in 2023. She was admitted to the Illinois bar in December of 2023.

**ANSWER:**

Upon information and belief, Defendant admits the allegations in Paragraph 10.

**COMPLAINT ¶11:**

Chehade is a Muslim Arab woman who has long been active in her community. At DePaul, she was President of the Muslim Student Association, and at Georgetown Law, she was Co-President of the Muslim Law Student Association ("MLSA"). Consistent with those roles, Chehade has a history of advocacy for Palestinian rights, an issue which is not only a matter of justice but personal for her, as she has family and friends in Gaza and Lebanon. In that regard, Chehade also had leadership roles in Students for Justice in Palestine ("SJP") at DePaul and Georgetown.

**ANSWER:**

Upon information and belief, Defendant admits Plaintiff is a Muslim Arab woman and

was involved in MLSA and SJP. Defendant lacks knowledge or information sufficient to form a

belief as to the truth or falsity of the remaining allegations in Paragraph 11.

**COMPLAINT ¶12:**

On July 29, 2022, during a summer clerkship at Foley prior to her third year of law school, Foley offered Chehade a full-time associate position at its Chicago office starting in the fall of 2023, which she accepted. Chehade looked forward to beginning her first job as an attorney at Foley, and helping to support her family as a first-generation American. She rented an apartment downtown near Foley's office, purchased appropriate business attire, and prepared for her October 23, 2023 start date.

**ANSWER:**

Defendant admits the allegations in the first sentence of Paragraph 12. Defendant lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations in Paragraph 12.

**COMPLAINT ¶13:**

Chehade accepted an offer from Foley only after Foley personally assured her that it embraced her identity, heritage, and beliefs as an Arab Muslim. Chehade's support for the human and national rights of Palestinians are central to her cultural identity.

**ANSWER:**

Defendant admits that Plaintiff accepted an offer to join Foley as an associate. Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of Plaintiff's allegations regarding her support of Palestinians being central to her identity. Defendant denies the remaining allegations in Paragraph 13.

**COMPLAINT ¶14:**

Yet it was that very identity which prompted Foley management, on October 22, 2023, to (1) interrogate Chehade about her beliefs, her prior association with Students for Justice in Palestine, and her community ties, including her father's employment position at a local mosque, and (2) fire her on a Sunday evening, just 15 hours before she was scheduled to start her first day of work as an attorney.

**ANSWER:**

Defendant denies the allegations in Paragraph 14.

**COMPLAINT ¶15:**

By contrast, Foley did not terminate the employment of Foley attorneys who openly supported Israeli violence against Palestinians. Unlike Chehade, they were not expressing Arab or Muslim identities or solidarity and did not associate with Palestinians.

**ANSWER:**

Defendant denies the allegations in Paragraph 15. Answering further, Defendant admits that no other attorney made statements or otherwise engaged in conduct expressing support for or condoning the October 7, 2023 terrorist attacks by Hamas and was not terminated.

**Foley's Purported Commitment to Diversity and Alleged Assurances to Chehade**

**COMPLAINT ¶16:**

For years, many clients of Foley and other large law firms have expected and demanded that their law firms be diverse in terms of women and ethnic minority attorneys.

**ANSWER:**

Defendant admits that diversity, equity and inclusion have been a focus at Foley and in

the legal profession generally for many years, and denies the remaining allegations in Paragraph

16.

**COMPLAINT ¶17:**

Accordingly, Foley has sought to enhance its attractiveness to top minority law students
and existing and potential clients by touting its purported commitment to diversity and inclusion.
Foley has broadcast this message through its website and other advertising and marketing
materials, including press releases. As then Foley Chairman and CEO Jay Rothman declared in
2021:

> At Foley, we believe our firm should reflect the diverse world we serve.
> People from different backgrounds challenge each other, foster greater creativity,
> and uncover new and better ways of doing business. We will continue to call on
> our attorneys, professional staff and clients to help us foster an environment that
> fully reflects and embraces the rich cultural heritage of the communities where we
> practice law.

> Foley has attempted to boost its ranking in The American Lawyer's "Diversity
> Scorecard" by making a particular effort to hire attorneys who are what it labels "women of
> color." In June of 2022, Foley boasted that it had increased its ranking on the Diversity
> Scorecard by 31 spots.

**ANSWER:**

Defendant admits the quote in Paragraph 17 is from Jay Rothman and on Foley's website.

Answering further, Defendant is committed to diversity and inclusion and shares its commitment

internally and externally. To the extent any allegations remain in Paragraph 17, Defendant

denies them.

**COMPLAINT ¶18:**

Foley's Chief Diversity and Inclusion Partner described Foley's alleged commitment to
diversity as allowing attorneys to bring their "authentic self" to the workplace:

> We are striving to be a community where everyone can reach their full
> potential. We are relentlessly focused on creating a workplace where everyone
> can bring their authentic self regardless of ethnicity, background, belief,
> orientation, gender expression, or personal need.

**ANSWER:**

Defendant admits it is committed to diversity and allowing people to bring their authentic selves to work.  Defendant admits that Eileen Ridley, Defendant's Chief Diversity and Inclusion Partner, made the statement in Paragraph 18.  To the extent any allegations remain in Paragraph 18, Defendant denies them.

**COMPLAINT ¶19:**

Foley's current Chairman and CEO Daljit Doogal stressed the firm's commitment to not just hiring, but retaining, diverse associates in his 2022 statement on Foley's website:

> In terms of ensuring Foley's diverse pipeline going forward, Doogal said, "We have been and we're continuing to be more focused on monitoring that pipeline along with [our] recruiting efforts," but "it's also about retaining [diverse associates and business professionals] and providing those leadership opportunities and providing them leadership training."

(bracketed in original).

**ANSWER:**

Defendant admits the allegations in Paragraph 19.  Answering further, Defendant states the quote in Paragraph 19 is from an interview of Daljit Doogal by Xiumei Dong, of Law 360.

**COMPLAINT ¶20:**

To demonstrate its purported commitment to diversity and inclusion, in [insert approximate date] Foley hired a Director of Diversity and Inclusion, Alexis Robertson, to coordinate its diversity and inclusion efforts firm wide, and to assure diverse recruits and associates that Foley's commitment to diversity is real. As Robertson declared: "Foley is committed to the success of our talent. Ensuring success requires us to weave diversity, equity, and inclusion into the fabric of the firm ...." Foley management authorized and encouraged Robertson to speak for the firm on issues of diversity and inclusion.

**ANSWER:**

Defendant admits it is committed to diversity and inclusion, that it hired Alexis Robertson as its Director of Diversity & Inclusion, and that Robertson performs various duties related to Diversity & Inclusion and believes that success requires Foley to have diversity, equity

and inclusion as part of the fabric of Foley. Defendant denies any remaining allegations in

Paragraph 20.

## COMPLAINT ¶21:

Foley aggressively markets its purported commitment to diversity in its recruiting pitch to law students. In addition, to the messaging quoted above, Foley touts its creation of "affinity groups" for diverse attorneys:

> We recognize the importance of providing our diverse talent with community-building and networking opportunities. We have national affinity groups for women, ethnic minorities, members of the LGBTQ community, and veterans. These groups help reinforce a sense of community, provide collaborative business development opportunities, and participate in mentoring and recruiting activities. The firm's affinity groups serve as a catalyst to promote inclusion, build community, and provide leadership opportunities for diverse attorneys within the firm. The groups meet regularly, setting their own agendas tailored to the needs of their members.

## ANSWER:

Defendant admits its commitment to diversity, that it shares its commitment internally

and externally, that it has formed a number of affinity groups to support diverse attorneys, and

that the above messaging is part of its commitment to diversity. To the extent any allegations

remain in Paragraph 21, Defendant denies them.

## COMPLAINT ¶22:

While applying for jobs, Chehade was impressed by Foley's professed commitment to diversity, including to retaining diverse associates.

## ANSWER:

Defendant admits it is committed to diversity, including retaining diverse associates.

Defendant is without knowledge or information sufficient to form a belief as to the truth or

falsity of the remaining allegations in Paragraph 22.

## COMPLAINT ¶23:

However, Chehade wanted to make sure that Foley's commitment extended to her as well, as a Muslim Arab woman active in her community. Chehade was aware of only one other visibly Muslim Arab woman attorney at Foley out of over 1,100 attorneys. In their recruiting and

marketing materials, Robertson and Foley discussed the importance of such groups as the Black Law Student Association, the National Bar Association, and LGBTQ groups in website posts directed to recruiting, but Chehade could find no mention of the MLSA.

**ANSWER:**

Defendant admits its commitment to diversity, and that it shares its commitment

internally and externally. Defendant is without knowledge or information sufficient to form a

belief as to the truth or falsity of the remaining allegations in Paragraph 23.

**COMPLAINT ¶24:**

Indeed, Chehade could find no reference to the words "Muslim" or "Arab" in any of Foley's recruiting materials. In addition, Foley's "affinity group" applicable to Chehade is the group is titled "Asian, Pacific and Middle Eastern Attorneys Affinity Group," a seemingly "all of the rest" grouping comprised of people of dramatically different heritages and concerns and corresponding with a geographic region that is comprised of more than 5 billion people. Therefore, Chehade had concerns over whether she was being recruited so that boxes could be checked on Foley's Diversity scorecard, and hence meet various clients' diversity quotas, without any real commitment to diversity or the inclusion and retention of Muslim and/or Arab attorneys.

**ANSWER:**

Defendant is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 24.

**COMPLAINT ¶25:**

Foley DEI Director Robertson had written that Foley had allowed a female attorney of Gullah heritage "to be her authentic self." In February of 2023, Robertson also published an article titled "Foley & Lardner: You are Not Diverse (and Neither of Us are Either)" which she co-authored with Foley's Manager of Diversity and Inclusion, Dan Sharpe, in which they declared: "It is only by saying what we actually mean that we can begin to address, the multitude of issues stemming from ***the unique histories of disparate groups*** typically lumped together under the umbrella of 'diversity.'" (emphasis added).

**ANSWER:**

Defendant admits the quote in Paragraph 25 is from an article written by Robertson and

Dan Sharpe. To the extent any further allegations remain in Paragraph 25, Defendant denies

them.

**COMPLAINT ¶26:**

Chehade found Robertson's statements encouraging, but she wanted reassurance from Robertson that Foley would embrace Chehade's own "unique history" as an Arab Muslim woman. In July 2022, while a Foley summer associate, Chehade met with Robertson to discuss her experience as a first-generation Muslim Arab woman and her concerns as to whether Foley would support her "authentic self." Robertson promised Chehade that Foley indeed valued and supported Chehade's Arab Muslim heritage and perspective and embraced her history and values.

**ANSWER:**

Defendant admits Plaintiff and Robertson had lunch during July 2023. Defendant denies Robertson made any promises or guarantees to Plaintiff or that Ms. Robertson was made aware of, or embraced, any perspective or values held by Chehade that would support a terrorist attack of the nature perpetrated by Hamas on October 7, 2023. Defendant lacks knowledge or information to form a belief to truth or falsity of the remaining allegations in Paragraph 26.

**COMPLAINT ¶27:**

Robertson's assurances to Chehade were critical in her decision to accept Foley's July 29, 2022 offer of an associate position. As a result, and in reasonable reliance upon these promises, she accepted the position and did not pursue other available job opportunities. Chehade's scheduled start date was October 23, 2023. Chehade would later learn that Robertson's assurances were a sham.

**ANSWER:**

Defendant denies making any promises or guarantees to Plaintiff. Defendant is without knowledge or information sufficient to form a belief to the truth or falsity of what Plaintiff deemed critical to accepting Foley's offer of employment. Defendant denies the remaining allegations in Paragraph 27.

**COMPLAINT ¶28:**

On October 21, 2023, Lisa Noller, Foley Partner and Chair of Litigation, asked Chehade to attend a meeting on October 22, 2023. She said the purpose of the meeting was to discuss "what you've been doing on social media." Immediately, Chehade reached out by email to Robertson for guidance and support. Robertson never responded; in modern parlance, Foley's

DEI Director deliberately "ghosted" Chehade in her hour of greatest need, at the expense of the very diversity for whose promotion she had been hired.

**ANSWER:**

Defendant admits that, on October 21, 2023, Noller reached out to Plaintiff for a meeting

on October 22, 2023 to discuss Plaintiff's conduct at a City Council meeting and her social

media activity. Defendant admits Plaintiff sent Robertson an email late in the evening on

October 21, 2023, and denies the remaining allegations in Paragraph 28.

**COMPLAINT ¶29:**

Thereafter, Foley CEO Doogal, the purported champion of hiring and retaining diverse associates, directed the firing of Chehade.

**ANSWER:**

Defendant admits Doogal is a champion of hiring and retaining diverse associates.

Defendant denies the remaining allegations in Paragraph 29.

**The Context of Foley's Firing of Chehade**

**COMPLAINT ¶30:**

On October 7, 2023, scores of Hamas gunmen broke through the wall bordering Gaza and Israel and swept into towns, military bases and a music festival near the border of Gaza. During Hamas's attack, more than 1,160 people were killed, including approximately 767 civilians, and Hamas took more than 250 people hostage.

**ANSWER:**

Defendant admits that on October 7, 2023 Hamas engaged in terrorist attacks upon Israel.

Defendant is without knowledge or information sufficient to form a belief as to the exact impact

of the attack but admits a significant number of people were killed and/or taken hostage.

**COMPLAINT ¶31:**

Following the Hamas attack, starting on October 8, 2023, Israel launched a massive military offensive on Gaza's people and civilian infrastructure with the express purpose of collective punishment; as IDF spokesperson Rear Admiral Daniel Hagari admitted on October

10, "the emphasis is on damage and not on accuracy."[2] On October 9, Israeli Defense Minister Yoav Gallant announced "a complete siege" on Gaza, adding, "There will be no electricity, no food, no fuel, everything is closed. . . . We are fighting human animals and we are acting accordingly."[3]

**ANSWER:**

Defendant admits Israel responded to the Hamas terrorist attacks, and lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 31.[4]

**COMPLAINT ¶32:**

Similar vows were made in the following days, weeks and months: In its December 28, 2023 petition before the International Court of Justice, the government of South Africa detailed nine pages of examples of statements from Israeli officials since October 7, including:

  a.   Israeli Knesset ('MKs') have repeatedly called for Gaza to be "wiped out", "flatten[ed]", "eras[ed]", and "[c]rush[ed] . . . on all its inhabitants."

  b.   The Israeli Minister of Agriculture "recalled the [ethnic cleansing] 1948, in which over 80 percent of the Palestinian population of the new Israeli State was forced from or fled their homes, stating that '**[w]e are now actually rolling out the Gaza Nakba**'."

  c.   On 13 October 2023, Israel's Minister of Energy and Infrastructure said: "All the civilian population in [G]aza is ordered to leave immediately. We will win. They will not receive a drop of water or a single battery until they leave the world."[5]

**ANSWER:**

Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 32.

---

[2] Bethan McKernan & Quique Kierszenbaum, '*We're focused on maximum damage': ground offensive into Gaza seems imminent*, the Guardian, October 10, 2023, *available at* https://www.theguardian.com/world/2023/oct/10/right-now-it-is-one-day-at-a-time-life-on-israels-frontline-with-gaza.
[3] Emanuel Fabian, *Defense minister announces 'complete siege' of Gaza: No power, food or fuel*, the Times of Israel, October 9, 2023, *available at* https://www.timesofisrael.com/liveblog_entry/defense-minister-announces-complete-siege-of-gaza-no-power-food-or-fuel/.
[4] Defendant acknowledges that Plaintiff included footnotes in Paragraph 31-33 that do not contain allegations, and to the extent Plaintiff meant make allegations in the footnotes, she has failed to do so.
[5] Republic of South Africa, *APPLICATION INSTITUTING PROCEEDINGS*, International Court of Justice, December 28, 2023, available at https://www.icj-cij.org/sites/default/files/case-related/192/192-20231228-app-01-00-en.pdf

**COMPLAINT ¶33:**

Quickly thereafter, people who protested Israel's indiscriminate bombing of civilians in Gaza were labeled "antisemitic." The government of Israel itself reportedly participated in this campaign; according to the Israeli website YNet news, "the Foreign and the Diaspora Affairs ministries have formulated an action plan aimed at inflicting economic and employment consequences" on what the website refers to as "antisemitic students."[6] YNet went on to report that this plan has already been implemented at "major law firms in the U.S."[7]

**ANSWER:**

Defendant admits Plaintiff references a link to a website but lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 33.

**COMPLAINT ¶34:**

Chehade, a long-time supporter of Palestinian human rights, spoke out about Israel's indiscriminate bombing of civilians of Gaza at an October 11, 2023 meeting at City Hall and through posts on her personal social media account.

**ANSWER:**

Defendant admits that Plaintiff spoke at an October 11, 2023 meeting at Chicago City Hall and stated the Hamas attacks were not unprovoked, and that Plaintiff reshared at least one post on social media on October 7, 2023 condoning the Hamas attacks. Answering further, the transcript of the meeting speaks for itself as to all the comments made by Plaintiff. Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of Plaintiff's allegation that she is a long-time supporter of Palestinian Human Rights. Defendant denies the remaining allegations in Paragraph 34 of the Complaint.

---

[6] Itamar Eichner, *Shaming and pressuring donors: Israel's strategy against antisemitism on US campuses*, Ynetnews, November 25, 2023, available at https://www.ynetnews.com/article/rk5ppryht
[7] *Id*.

**Foley's Investigation and Alleged Interrogation of Chehade**

**COMPLAINT ¶35:**

Unbeknownst to Chehade, Foley began investigating her background and social media posts. On information and belief, by Friday, October 20, 2023, Foley had developed a plan to terminate Chehade before she officially started her position on Monday, October 23, 2023. On information and belief, Foley management, including DEI Director Robertson, were participants in crafting that plan.

**ANSWER:**

Defendant denies the allegations in Paragraph 35.

**COMPLAINT ¶36:**

Foley had earlier lost a discrimination case brought by a Muslim associate fired by the Chicago Office in the wake of 9/11 and his articles about Islam (*Hasan v. Foley*, 552 F.3d 520 (7th Cir. 2008)). Accordingly, upon information and belief, Foley wanted to engage in the pretense of allowing Chehade to give her side of the story in a Sunday afternoon "interview" before firing her. That charade would also allow Foley to point to Chehade's answers to the scripted "interview" as the pretext for firing her if she said the wrong thing.

**ANSWER:**

Defendant denies the allegations in Paragraph 36.

**COMPLAINT ¶37:**

On Saturday, October 21, 2023, Lisa Noller, Foley's Chair of Litigation, called Chehade and asked her to attend a meeting on October 22, 2023, stating: "We've seen what you've been doing on social media and need you to come into office for a meeting tomorrow at 1:00."

**ANSWER:**

Defendant admits that, on October 21, 2023, Noller reached out to Plaintiff for a meeting at 1:00 p.m. on October 22, 2023 regarding Plaintiff's behavior at a City Council meeting and Plaintiff's social media activity. To the extent any allegations remain in Paragraph 37, Defendant denies them.

**COMPLAINT ¶38:**

When Chehade arrived at the Sunday, October 22, 2023 meeting, Noller and Frank Pasquesi, the Managing Partner of the Chicago office, met her in the lobby of Foley's conference room floor.

**ANSWER:**

Defendant admits the allegations in Paragraph 38. Answering further, Pasquesi first saw

Plaintiff on the first floor of the office building in which Foley is located and escorted her to the

conference room floor.

**COMPLAINT ¶39:**

Noller and Pasquesi proceeded to interrogate Chehade in a hostile manner about her
student activism, her community associations, her October 11, 2023 remarks at a Chicago City
Hall meeting, and her post on her personal social media page which contextualized Hamas's
attack in Israel's longtime violent occupation, colonization of Palestine, and the Palestinian
struggle for freedom.

**ANSWER:**

Defendant denies the allegations in Paragraph 39.

**COMPLAINT ¶40:**

Noller and Pasquesi claimed Foley happened across Chehade's social media posts
because the office was looking for a picture of her to put on the website directory. That
explanation was false; Foley had already requested a photo directly from Chehade for its
website, and she had provided it by the deadline provided.

**ANSWER:**

Defendant admits it came across Chehade's social media posts when it was looking for an

updated picture of Chehade for a new attorney directory. Defendant denies the remaining

allegations in Paragraph 40.

**COMPLAINT ¶41:**

During the interrogation, Noller and Pasquesi questioned Chehade extensively about her
previous leadership role in Students for Justice in Palestine ("SJP"), a student organization with
branches all over the country with a long history of civil and nonviolent advocacy for "justice,
human rights, liberation, and self-determination for the Palestinian people."

**ANSWER:**

Defendant admits Plaintiff was questioned about SJP and denies the remaining

allegations in Paragraph 41.

**COMPLAINT ¶42:**

Though Chehade informed Noller and Pasquesi that she was no longer involved with SJP, they grilled her about what they claimed was the language of alleged SJP social media posts which she played no role in drafting.

**ANSWER:**

Defendant admits Plaintiff was questioned about SJP and that she said she was no longer involved with SJP. Answering further, Defendant states that Plaintiff included information about her involvement with SJP on her resume to Foley. To the extent any allegations remain in Paragraph 42, Defendant denies them.

**COMPLAINT ¶43:**

Specifically, Noller alleged that SJP had used the phrase "by any means necessary" and made posts "endorsing terrorism." Chehade explained that she was not aware of such posts by SJP, and that she had graduated and was therefore no longer a member of SJP. She suggested to Noller and Pasquesi that if they had questions about SJP's intentions, they could ask SJP directly. Noller replied that Chehade was not answering her questions. Chehade reiterated that she did not know what social media posts they were referring to, and confirmed she was no longer affiliated with SJP and had no role in crafting the alleged social media posts Noller was asking her about.

**ANSWER:**

Defendant admits that Noller asked Plaintiff about her use of the phrase "by any means necessary" and that Plaintiff failed to answer questions asked of her during the meeting with Noller and Pasquesi, including but not limited to, questions about SJP. To the extent any allegations remain in Paragraph 43, Defendant denies them.

**COMPLAINT ¶44:**

Noller and Pasquesi also questioned Chehade about her speech at City Hall, in which she spoke in opposition to a resolution which condemned the Hamas attack but completely absolved Israel of any responsibility for the deaths of what, at that time, amounted to more than double the number of people killed during the Hamas attack. Chehade stated that she spoke as a concerned citizen with family and friends whose lives were at stake in Gaza and Lebanon.

**ANSWER:**

Defendant admits Noller and Pasquesi asked Chehade about her speech at City Hall in opposition to a resolution condemning the Hamas attacks. Answering further, Defendant states that the City Council resolution speaks for itself as to its contents. To the extent any allegations remain in Paragraph 44, Defendant denies them.

**COMPLAINT ¶45:**

Noller and Pasquesi asked Chehade about a statement she made during her speech in which she said that the Hamas attack was not "unprovoked" (contrary to what Israeli President Herzog and White House National Security Council spokesperson Adrienne Watson had claimed), but rather the "natural result of 75 years of occupation and violence by Israeli forces." Noller and Pasquesi asked Chehade what she meant by that statement. Chehade explained that she was providing historical and political context, and that the Israeli-Palestinian conflict could not be resolved without understanding that context.

**ANSWER:**

Defendant admits that Plaintiff was asked about her comment that the Hamas attacks were not unprovoked and that Plaintiff stated she was trying to provide a different context to the conflict. Defendant denies the remaining allegations in Paragraph 45.

**COMPLAINT ¶46:**

Pasquesi also asked Chehade why she did not condemn Hamas in her speech. Chehade explained that her focus on social media was on what was happening in Gaza and her fear for her family and friends. The Israeli perspective, as well as the concern over the Israeli civilians who were killed on October 7, were already all over the mainstream media and were the focus of the six speakers who preceded her at the City Council hearing. Chehade's focus and aim was the protection of the more than two million people in Gaza who were under ongoing bombardment and the provision of context that was missing from mainstream narratives.

**ANSWER:**

Defendant admits Plaintiff did not condemn but rather condoned the Hamas attacks. Answering further, Defendant states Plaintiff did express fear for her family and friends and denies the remaining allegations in Paragraph 46.

**COMPLAINT ¶47:**

Chehade stated clearly that she did not endorse the targeting of civilians. Pasquesi asked whether Chehade "condemn[ed] Hamas and the October 7 attacks."

**ANSWER:**

Defendant admits Chehade was asked if she condemned the Hamas attacks on October 7, 2023. Answering further, Defendant admits that Chehade said during the meeting she condemns Hamas for any attacks on civilians. Answering further, Chehade's October 7, 2023 post on Instagram said in part: "If you support Palestine understand that necessitates supporting our right to defend ourselves and liberate our homeland by any means necessary." Defendant denies the remaining allegations in Paragraph 47.

**COMPLAINT ¶48:**

Chehade responded that yes, she condemns any loss of human life. She also commented that racial and religious stereotypes have resulted in an atmosphere in which Muslims and Arabs are always expected to apologize for or denounce terrorist attacks they had no involvement in, whereas the same demands are not made with respect to Israel's crimes against civilians.

**ANSWER:**

Defendant denies the allegations in Paragraph 48.

**COMPLAINT ¶49:**

Noller and Pasquesi also quizzed Chehade about her "role in the community" and the workplace of her father, who serves as Communications Director of Mosque Foundation in Bridgeview, Illinois, one of the largest mosques in the United States.

**ANSWER:**

Defendant denies the allegations in Paragraph 49.

**COMPLAINT ¶50:**

Chehade asked Noller and Pasquesi if they monitored the personal opinions of other attorneys in this manner. They responded, "We don't censor people except if it's terrorism and inciting violence." They said Foley "value[s] diversity" and they do not want to make other associates feel unwelcome by someone's personal views. At no time was Chehade ever advocating "terrorism and inciting violence," and she made that clear during the interrogation.

**ANSWER:**

Defendant admits that Noller and Pasquesi told Plaintiff that Defendant values diversity, inclusivity, and ensuring people feel comfortable in the workplace. Defendant denies the remaining allegations in Paragraph 50.

**COMPLAINT ¶51:**

That evening, Pasquesi informed Chehade that her employment offer was revoked. Pasquesi said he would follow up with an email explanation. However, neither Mr. Pasquesi nor anyone else at Foley followed up with that email explanation, likely because Foley could not point to anything Chehade said during the interrogation as a basis for firing her.

**ANSWER:**

Later that same evening, Sunday, October 22, Defendant admits Pasquesi and Noller told Chehade that her employment offer was rescinded. Defendant denies the remaining allegations in Paragraph 51.

**COMPLAINT ¶52:**

Foley's termination of Chehade's employment caused her great disappointment, emotional distress, loss of past and future earnings, and financial hardship.

**ANSWER:**

Defendant denies the allegations in Paragraph 52.

**Foley's Alleged Double Standard**

**COMPLAINT ¶53:**

On information and belief, Chehade was the only attorney whose social media posts Foley searched in the weeks following October 7, 2023.

**ANSWER:**

Defendant denies searching for Plaintiff's social media posts but rather came across them while looking for an updated picture of Plaintiff for a new attorney directory. Defendant denies the remaining allegations in Paragraph 53.

**COMPLAINT ¶54:**

On information and belief, Chehade was the only attorney Foley interrogated about past membership in student advocacy groups.

**ANSWER:**

Defendant denies that it interrogated Plaintiff and denies any remaining allegations in

Paragraph 54.

**COMPLAINT ¶55:**

On information and belief, Chehade was the only attorney Foley interrogated about their role in "the community" and their parents' role in a religious institution.

**ANSWER:**

Defendant denies Plaintiff was interrogated about her role in the community and her

parents' role in any religious institution. To the extent any allegations remain in Paragraph 55,

Defendant denies them.

**COMPLAINT ¶56:**

Contrary to its professed commitment to nonviolence, Foley does not investigate or censor attorneys who condone violence against Palestinians.

**ANSWER:**

Defendant denies the allegations in Paragraph 56.

**COMPLAINT ¶57:**

Several Foley partners openly and publicly support the actions (including the violence) of Israel towards Palestinians in Gaza, even though such actions have caused civilian deaths by the tens of thousands, the restriction of entry of humanitarian aid into Gaza as children are starving, and the detention of thousands of Palestinians without charge or trial. For example:

    a.    Chicago office Foley partner Max Chester posted a video on the website LinkedIn in which the speaker advocated for deporting anyone in the United Kingdom holding a Hamas flag, saying they should be "sent to the Gaza and try your luck there."

    b.    Foley partner Dovi Adlerstein publicly shared on LinkedIn a post he described as "well said," which stated, in part, [I]f you're focused on the people of Gaza right now, you're either ignorant or intentionally hypocritical. . . . The Palestinian

people elected Hamas. Make up your mind. If there are people who you believe deserve a state then it's time you held them accountable as a people." The post made clear that holding the Palestinian people "accountable" means killing them; it said people should either "stand with Israel while we cleanse the world of Hamas savages or you can go ahead and keep your mouth shut . . . ." It also rejected claims that the number of civilians Israel was killing in Gaza was disproportionate. The post also called for the relocation of Gaza's entire population: "They have nowhere to go those poor Gazans? Why don't you look at a map? They have a border with Egypt. Let them take them in if they care so much."

    c.    For more than eight months, Chicago office Foley partner Michael Kasdin has maintained a public "STAND WITH ISRAEL" photo published by the American Jewish Committee (AJC) on his Instagram profile. The AJC has repeatedly justified Israel's indiscriminate killing of Palestinian civilians. The AJC also approvingly labeled the Israeli terrorist organization Haganah as "a Jewish paramilitary organization that played a significant role in the defense of Jewish communities in British Mandate Palestine." As part of Plan Dalet, a campaign to ethnically cleanse Palestine, the Haganah committed several terrorist attacks, such as the 1947 massacre in the village of Balad al-Sheikh, in which the Haganah bombed houses and pulled all the men out of their houses and shot them, eventually succeeding in its goal of depopulating that village.

## ANSWER:

Defendant admits the posts described in Paragraph 57 (a) and (b) were made, and denies Plaintiff's interpretation of the posts. Defendant denies that Max Chester is a partner in its Chicago office and states affirmatively that Chester is a partner in its Milwaukee office. Defendant lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 57 (c).

## COMPLAINT ¶58:

On information and belief, Foley management has been aware of these and similar social media posts and communications, none of which has resulted in employment termination.

## ANSWER:

Defendant admits that it has not terminated anyone, including Plaintiff, because of social media posts and communications. Defendant denies any remaining allegations in Paragraph 58.

**Count I**
**Alleged Discrimination on the Basis of Ethnicity, Religion, and Association**
**Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1)**
**Illinois Human Rights Act ("IHRA"), 775 ILCS 5 §§ 1-102, 2-102**

**COMPLAINT ¶59:**

Each paragraph of this Complaint is incorporated as if fully restated herein.

**ANSWER:**

Defendant reasserts its responses to Paragraphs 1-58 as though fully set forth herein.

**COMPLAINT ¶60:**

In deciding to terminate Plaintiff's employment, Foley relied on stereotypes about Arabs, Muslims and Palestinians as inherently violent and anti-Jewish.

**ANSWER:**

Defendant denies the allegations in Paragraph 60.

**COMPLAINT ¶61:**

Foley terminated the employment of Chehade purportedly for ignoring or excusing the killing of Israelis while it tolerated employee speech that called for or excused the killing of tens of thousands of Palestinians.

**ANSWER:**

Defendant denies the allegations in Paragraph 61.

**COMPLAINT ¶62:**

Foley's discriminatory application of its claimed workplace policies and values illustrates a failure to view Israeli and Palestinian lives as having equal worth.

**ANSWER:**

Defendant denies the allegations in Paragraph 62.

**COMPLAINT ¶63:**

Foley's discriminatory application of its claimed workplace policies and values reflects anti-Palestinian, anti-Arab and anti-Muslim racism.

**ANSWER:**

Defendant denies the allegations in Paragraph 63.

**COMPLAINT ¶64:**

Foley's claim to have censored Plaintiff because of her advocacy for "terrorism and inciting violence" is pretext for its anti-Palestinian racism.

**ANSWER:**

Defendant admits it believes Plaintiff condoned terrorist acts and denies the remaining

allegations in Paragraph 64.

**COMPLAINT ¶65:**

Foley imposed different standards on its non-Arab, non-Muslim employees who did not have strong associations with Palestinians in determining whether they would make others feel "unwelcome because of their personal views," and therefore were fit for termination.

**ANSWER:**

Defendant denies the allegations in Paragraph 65.

**COMPLAINT ¶66:**

Plaintiff's Arab ethnicity, her Muslim faith and affiliations, and her association with Palestinians as well as with organizations seeking to promote the interests of Palestinians were motivating factors in Foley's decision to terminate her employment.

**ANSWER:**

Defendant denies the allegations in Paragraph 66.

**Request for Relief**

WHEREFORE, Plaintiff respectfully requests:

- All past, present and future lost earnings, benefits, and renumeration Plaintiff would have received if Foley had not terminated her employment;

- Prejudgment interest;

- Compensation for emotional distress;

- Punitive damages;

- Attorneys' fees and costs; and

- Such other relief as law and justice allow.

**ANSWER:**

Defendant denies that Plaintiff is entitled to any relief in this action, including but not limited to the relief requested in this Paragraph. Defendant also denies that it committed any wrongdoing and/or violated any statute.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming the burden of proof where it otherwise rests with Plaintiff, Defendant asserts the following affirmative and other defenses to the Complaint:

### FIRST DEFENSE

All or part of any punitive claims against Defendant are barred because Defendant has made good faith efforts to comply with all applicable laws.

### SECOND DEFENSE

Plaintiff's claims, in whole or in part, fail to state a claim upon which relief can be granted as a matter of fact or law.

### THIRD DEFENSE

Plaintiff's claim for damages must be barred to the extent Plaintiff has failed to mitigate her damages.

### FOURTH DEFENSE

To the extent Plaintiff has mitigated her damages, any award of damages that may be due to Plaintiff must be offset by such mitigation.

### FIFTH DEFENSE

Defendant neither engaged in the alleged discrimination against Plaintiff, nor aided or abetted it, nor authorized, encouraged, condoned, ratified, tolerated, or approved any of the alleged discrimination against Plaintiff, and instead prohibited and continues to prohibit such

acts, and any such conduct may not be attributed to Defendant through principles of agency, *respondeat superior*, or otherwise.

## SIXTH DEFENSE

Plaintiff's causes of action are barred, in whole or in part, by the doctrine of laches.

## SEVENTH DEFENSE

Any and all conduct of which Plaintiff complains or which is attributed to Defendant was a just and proper exercise of management discretion, at all times privileged and justified, and undertaken for fair and honest reasons, in good faith and without malice.

## EIGHTH DEFENSE

Plaintiff's claims and alleged damages may be barred or limited by the after-acquired evidence doctrine.

## NINTH DEFENSE

Defendant had legitimate, nondiscriminatory and non-pretextual reasons for the employment actions it took regarding Plaintiff.

## TENTH DEFENSE

Defendant denies that any of the characteristics alleged by Plaintiff were a factor or motive in any of the employment decisions concerning Plaintiff. However, in the event that the fact finder determines otherwise, Defendant avers that it would have made the same decisions even in the absence of any alleged impermissible factor/motivation.

DATED: June 28, 2024                                      Respectfully submitted,

                                                         FOLEY & LARDNER LLP


                                                         By: /s/ *Tracy M. Billows*
                                                         _____
                                                              One of Its Attorneys

Tracy M. Billows, Bar No. 6274578
tbillows@seyfarth.com
Gerald L. Pauling
gpauling@seyfarth.com

SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
Telephone:   (312) 460-5000
Facsimile:    (312) 460-7000

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that on June 28, 2024, the foregoing **ANSWER** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

*/s/ Tracy M. Billows*
Tracy M. Billows
