**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JINAN CHEHADE, | |
| Plaintiff, | Case No: 1:24-cv-04414 |
| v. | Judge Sharon Johnson Coleman |
| FOLEY & LARDNER, LLP, | Magistrate Judge Keri Holleb Hotaling |
| Defendant. | |

**<u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT</u>**

**DATED: April 9, 2025**

Respectfully submitted,

Foley & Lardner LLP

By: */s/ Tracy M. Billows*
        One of Its Attorneys

Gerald L. Pauling (gpauling@seyfarth.com)
Tracy M. Billows (tbillows@seyfarth.com)
Emily J. Miller (emmiller@seyfarth.com)
Seyfarth Shaw LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

***Attorneys for Foley & Lardner LLP***

Defendant Foley & Lardner LLP ("Foley") submits the following memorandum of law in support of its motion for summary judgment.

## <u>INTRODUCTION</u>

This is an uncomplicated, one-count discrimination case stemming from a dispute about a legitimate recission of an employment offer. The underlying material facts are entirely undisputed, and this case is ripe for summary judgment. Foley hired Plaintiff Jinan Chehade ("Plaintiff") as a Summer Associate in 2022. At the end of her summer, Foley offered Plaintiff an Associate position to begin in October 2023 after she completed law school. While Foley was preparing for Plaintiff's return in October 2023, it learned that she had made public statements about the October 7, 2023 Hamas terrorist attack on Israel that could reasonably be construed as condoning the attack. For example, it is undisputed that on the very day that Hamas launched an attack on Israel, killing more than 1,200 people, taking an additional 254 hostage, including children, and committing acts of sexual violence, Plaintiff publicly re-posted a message on social media that said "[i]f you support Palestine, understand that necessitates our right to defend ourselves and liberate our homeland **by any means necessary**" (emphasis added). It is further undisputed that, on October 11, 2023, in a public speech at City Hall opposing a resolution condemning the Hamas attack, Plaintiff stated that the attack was "the **natural response** to 74 years of occupation, such that this resistance is **a legal right** for the Palestinian people according to international law… I'm sorry the people of Gaza did not sit quietly" (emphasis added).

The undisputed evidence shows that rather than take action based on the public comments alone, which it would have been entitled to do, Foley asked the Office Managing Partner of its Chicago Office and the Chair of the Litigation Department (the office and department Plaintiff was slated to join) to meet with Plaintiff in person to get Plaintiff's perspective on the issue and to see how she responded to learning of the firm's concerns. The undisputed evidence further shows that both the Office Managing Partner and Litigation

1

Department Chair left that meeting with Plaintiff with the impression that Plaintiff condoned the Hamas terrorist attack. As a result, Foley determined that Plaintiff's conduct violated its core values, and it rescinded its offer of employment to her.

Plaintiff alleges that Foley rescinded its offer to her because of her ethnicity, religion, and association with Palestinian people—but her unfounded theory is illogical because Foley made <u>two</u> offers of employment to her fully aware of her identities and relevant associations. Plaintiff's identities and association with Palestinian people did not change between when Foley offered her a Summer Associate position, when it offered her an Associate position, or when it was preparing for her return in October 2023. What changed is that Foley learned that Plaintiff made public statements that could reasonably be construed as condoning Hamas's October 7, 2023 terrorist attack on Israel on the day of the attack and in the days that followed. Foley's decision to rescind its offer to Plaintiff was based on Plaintiff's public statements and her reaction when asked about them—it had nothing to do with her ethnicity, religion, or association with any other person(s). For these, and all the reasons set forth below, Foley is entitled to summary judgment.[1]

## STATEMENT OF FACTS

### I. Foley Hired Plaintiff Twice With Full Awareness of Her Identities

#### A. Foley Offers Plaintiff a 2022 Summer Associate Position

In August 2021, Foley interviewed Plaintiff for a 2022 Summer Associate position through the Georgetown University Law Center ("GULC") On-Campus Interview ("OCI") process. SF ¶1. At the top of the resume that Plaintiff submitted to Foley through the OCI process, Plaintiff listed her memberships in the Muslim Law Students Association and the Arab Law Students Association at GULC in addition to her undergraduate leadership role in the Muslim Students Association at DePaul University. *Id.* ¶2. (Although Plaintiff testified that she

---

[1] The factual assertions in Foley's introduction are included in Foley's Rule 56.1 Statement of Undisputed Material Facts incorporated herein.

was President of Students for Justice in Palestine ("SJP") DePaul, co-founder and President of SJP Chicago, and co-founder of Law Students for Justice in Palestine ("LSJP") at GULC, she did not include those memberships on her OCI resume. SF ¶¶9-10.) Foley interviewed Plaintiff twice through the OCI process. *Id.* ¶3. Plaintiff testified that she told the OCI interviewers that she grew up in "Little Palestine," a nickname given to Bridgeview, Illinois, and that she told them "[a]bout growing up in [] a predominantly Muslim and Arab community and how that molded [her] in a post 9/11 environment when Muslims were demonized and scrutinized for our background." *Id.* ¶4. On August 31, 2021, Foley offered Plaintiff a 2022 Summer Associate position, and Plaintiff accepted the offer on September 10, 2021. *Id.* ¶5.

After she accepted Foley's Summer Associate offer, Plaintiff applied to the 2022 Diversity Fellowship Program for Summer Associates at Foley. SF ¶6. In the personal statement that Plaintiff submitted as part of her application for the Diversity Fellowship, Plaintiff identified herself as "a visible Muslim Arab American first generation woman with a physical disability," and she said that "Foley and Lardner's commitment to diversity and community-based efforts align with [her] mission and experience." *Id.* ¶7.

### B. Plaintiff Submits An Incomplete Conflicts Disclosure Form to Foley

Plaintiff submitted a Conflicts Disclosure Form on May 13, 2022 prior to the start of her Summer, and on that form, when asked to disclose "any memberships you currently hold," Plaintiff listed only her "Co-President" role for the Muslim Law Students Association. SF ¶8. Plaintiff did not disclose her role as co-founder of Law Students for Justice in Palestine ("LSJP") at GULC on the Conflicts Disclosure Form. *Id.* ¶9.

### C. Plaintiff Completes Her 2022 Summer Associateship & Foley Offers Her an Associate Position to Begin in October 2023

The 2022 Summer Associate program at Foley was ten weeks. SF ¶13. Plaintiff testified that, during her summer, she "remember[ed] talking about being from Bridgeview Little

Palestine… I don't go anywhere without saying I'm from Little Palestine." *Id.* ¶16. Plaintiff testified that no one mistreated her in any way during her Summer Associateship at Foley. *Id.* ¶17. On July 29, 2022, at the end of her Summer, Foley offered Plaintiff an entry-level Associate role at its Chicago Office following her law school graduation. SF ¶18. That same day, Plaintiff sent an email to Litigation Department Chair Noller, writing:

> I wanted to reach out and express my gratitude for all that you have done to make this summer as memorable and fruitful as it was. It was a pleasure learning from you and I appreciate your constant guidance throughout this process. I truly consider you to be a role model in so many ways.

*Id.* ¶19. Noller responded that same day, thanking Plaintiff for her "thoughtful note," wishing her a "wonderful 3rd year of law school," and writing that she would "look forward to seeing [Plaintiff] on the other side." *Id.* On September 7, 2022, Plaintiff accepted Foley's offer to return as an Associate in 2023 after she graduated law school. *Id.* ¶20.

### D. Plaintiff Submits a Second Resume to Foley—This Time Including Her Leadership Roles in SJP

Following her graduation from GULC, Plaintiff submitted a final transcript to Foley along with an updated version of her resume. SF ¶22. On the updated resume, in addition to the student organizations listed on her OCI resume, Plaintiff added that she was President of LSJP at GULC and that she was Founder and Chair of SJP Chicago. *Id.* Plaintiff made no other changes to the lists of student organizations on her resume. *Id.* ¶23.

### II. Hamas Launches A Terrorist Attack On Israel—And Plaintiff Makes Public Statements That Are Fairly Construed As Condoning The Attack

On October 7, 2023, the terrorist organization Hamas launched an attack on Israel. SF ¶24. In the attack, Hamas killed more than 1,200 people and took an additional 254 as hostages—including children—and committed other depraved acts, including acts of sexual violence. *Id.* On the day of the attack and the days that followed, Plaintiff publicly posted messages on social media regarding the attack, including posting on the day of the attacks that

"[i]f you support Palestine, understand that necessitates our right to defend ourselves and liberate our homeland **by any means necessary**" (emphasis added). *Id.* ¶37. Then on October 11, 2023, in a public speech at City Hall opposing a resolution condemning the Hamas attack, Plaintiff stated that the attack was "the **natural response** to 74 years of occupation, such that this resistance is **a legal right** for the Palestinian people according to international law." *Id.* ¶40.

### III.    Foley Learns Of Plaintiff's Public Statements About the Hamas Terrorist Attack on Israel And Meets With Her To Discuss Them

#### A.    Foley Inadvertently Learns About Plaintiff's Public Statements

On Thursday, October 12, 2023, Legal Recruiting Assistant Ayesha Karim wrote to Plaintiff to let her know that Foley planned to launch its "2023 New Associate Directory" prior to Plaintiff's arrival on October 23, 2023—and to ask that Plaintiff "upload [her] photo / headshot to [her] page by **Monday, October 16th**" in addition to updating some of the information Plaintiff previously provided to Foley. SF ¶25. On Saturday, October 14, 2023, Plaintiff replied to Karim's email, writing that she would "upload by [*sic*] photo and information before Monday." *Id.* ¶26. On Monday morning, Karim wrote to Plaintiff, "I hope you had a nice weekend. Thank you for letting me know. If you are unable to upload it by end of day today, please do let me know." *Id.* ¶28. Plaintiff testified that it was "fair to say" that she had not uploaded a photo by the time that Karim emailed her on the morning of October 16, 2023—and Karim corroborated that, testifying that Plaintiff had not uploaded a photo by that time. *Id.* ¶29.

Karim testified that she "Googled" Plaintiff later that day to try to locate a current photograph to use for the new associate directory. SF ¶30. Plaintiff was not the only incoming Associate whom Karim Googled that day to try to locate a current photograph for the directory. *Id.* Karim testified that when she Googled Plaintiff, she came across "a website that had information that was negatively conveyed" about Plaintiff and that she escalated the issue to her manager, Amy Moynihan, Director of Legal Recruiting. *Id.* ¶31. Moynihan testified that Karim

told her why Karim had searched for a photo and was concerned by things she saw. *Id.* ¶32. "She told [Moynihan] that she came across something concerning and she encouraged [Moynihan] to look for [herself]." *Id.* ¶32. Moynihan testified that she did then look for herself, including by looking at Plaintiff's public social media activity, and Moynihan thereafter spoke with her manager, Jennifer Patton, then Chief Talent Officer (current Chief Operating Officer) about the matter that same day. *Id.* ¶33.

### B. Foley Leadership Is Apprised of Plaintiff's Public Statements and Seeks Additional Information

At 1:42 pm on October 16, 2023, Moynihan wrote to Chairman and CEO, Daljit Doogal, former Managing Partner of Foley, Stanley Jaspan, and Chair of Foley's National Recruiting Committee, Robert Scher, copying Patton. SF ¶34. In that message, Moynihan wrote: "I wanted to make you aware that one of our incoming associates in Chicago, Jinan Chehade, has shared content on her public Instagram account that demonstrates her support and advocacy for the Palestinian stance during the Israel-Palestine conflict…" *Id.* Jaspan responded: "It would be helpful to know the nature of her statements. A pro-Palestinian stance itself is not a problem in my mind (at least as to her employment by the firm)." *Id.* ¶35. Doogal responded that he "agree[d] that more information would be good." *Id*. Moynihan and Patton thereafter collected additional information about public statements by Plaintiff. *Id.* ¶36.

Among other posts, Moynihan and Patton found that Plaintiff publicly re-posted the following to her Instagram account on October 7, 2023:

> If you support Palestine understand that necessitates supporting our right to defend ourselves and liberate our homeland by any means necessary. The colonizing power determined what was necessary when they colonized us by force and continue to genocide Palestine. You cannot claim to stand with Palestine if you prefer us to be slaughtered without fighting back.
>
> Freedom has only ever been achieved through resistance.

SF ¶37. When asked what she understood had occurred on October 7, 2023 at the time

she posted that message, Plaintiff testified:

> I honestly didn't know the complete picture of what was happening. Again, I don't follow mainstream media that much. My information is mainly through social media. So the focus was Gaza. I didn't know the full extent of what happened, but I knew that the people of Gaza had broken the fence or the wall that strides Gaza and the open air prison.

SF ¶38. Around that same time, Plaintiff also reposted a graphic displaying the words, "The Myth of 'Civilian Israelis'"—and she added her own text, writing: "THERE ARE NO CIVILIAN ISR*ELI'S [*sic*]" and "swipe through." *Id.* ¶39. On October 11, 2023, just four days after the Hamas terrorist attack, Plaintiff made the following remarks during a public meeting of the Chicago City Council:

> The Western Zionist controlled media machine would have you believe that this was an unprovoked attack. However, this is the natural response to 75 years of occupation, such that this resistance is a legal right for the Palestinian people according to international law… I'm sorry the people of Gaza did not sit quietly.

SF ¶40. Plaintiff did not condemn the Hamas attacks at the City Council meeting. *Id.* ¶41.

After Moynihan and Patton shared their further findings with leadership, Doogal consulted—or dispatched others to consult—additional individuals at Foley who he thought may have different perspectives on Plaintiff's conduct. SF ¶42.

### C. The Chicago Office Managing Partner and the Chair of the Litigation Department Meet with Plaintiff to Discuss Her Public Statements

While Foley considered a number of options over the course of five days, it was ultimately decided that Noller and Chicago Office Managing Partner, Frank Pasquesi, would meet with Plaintiff on Sunday, October 22, 2023. SF ¶43. On Saturday, October 21, 2023, Noller contacted Plaintiff by phone asking her to come into the office for a meeting the next day. *Id.* ¶44. Plaintiff testified that she left the call with Noller with the impression that Noller "was referring to [Plaintiff's] social media or just in general [Plaintiff's] advocacy for Palestine at that time." *Id.* ¶45. Plaintiff testified that she respected Noller, had worked with her during her Summer, and that Noller "knew [Plaintiff] personally." *Id.* ¶47. Plaintiff testified that she "didn't

see anything wrong in what [she] was doing or what [she] was saying," and that she planned to use the meeting with Noller as "a time to educate in open conversation." *Id.* ¶48.

On Sunday, October 22, 2023, Noller and Pasquesi met with Plaintiff at Foley's Chicago Office for approximately an hour. SF ¶49. Plaintiff testified that, during the meeting, Noller started by asking about Plaintiff's October 7, 2023 public Instagram post." *Id.* ¶50. Plaintiff testified that Noller also "went through the City Hall speech word-for-word," that Noller "interrogated[2] [Plaintiff]… about [her] involvement or prior involvement with SJP, [her] backgrounds and [her] beliefs when it comes to Palestine..." *Id.* ¶51.

According to Plaintiff, she told Noller and Pasquesi that, in her view, Hamas's October 7 attack on Israel was not "unprovoked" and that "mainstream media portrayed this as this was a completely random attack, but [her] aspect was we have to view this as a holistic matter." SF ¶53. Plaintiff testified that when she stated publicly at the City Council meeting that "this is the natural response to 75 years of occupation, such that this resistance is a legal right for the Palestinian people according to international law," she "was referring to the legitimacy of Palestinians to resist occupation." *Id.* ¶54. Regarding Noller and Pasquesi's questions about SJP, Plaintiff testified that they "asked [her] why [she] did not put SJP on [her] resume" and that she "told them that it was one page. [She] didn't think it was relevant." *Id.* ¶55.

As to Noller's impressions of Plaintiff during the meeting, Noller testified:

She was not answering any of our questions that would have given her an opportunity to say that she had an open mind about the conflict or that she did not agree with Hamas's attacks. I found her statements about the attacks to be troubling. She did not distance herself or apologize or express any empathy from the October 7 attacks, and **my takeaway based on the totality of everything that she said was that she condoned the attacks**….

SF ¶56. Pasquesi's impressions of Plaintiff during the meeting were similar. *Id.* ¶57.

---

[2] When asked what she meant by "interrogation," Plaintiff responded that "[i]t was question after question after question." SOF ¶51, n.3.

**IV.**     <u>**Foley Assesses that Plaintiff's Conduct Violated Its Core Values and Rescinds Its Offer to Her**</u>

Noller and Pasquesi met with Doogal, Jaspan, Patton, Chief Diversity & Inclusion Partner, Eileen Ridley, and inside employment counsel, Phil Phillips, following the meeting with Plaintiff to discuss their conversation with Plaintiff and to share their impressions. SF ¶58. As Doogal testified, it was ultimately his decision what would happen with Plaintiff's employment, and while he considered input from others, he made the decision to rescind Foley's offer of employment to Plaintiff based on Plaintiff's public statements, concerns about her judgment, and what Noller and Pasquesi shared with him about their impressions from their meeting with Plaintiff. *Id.* ¶¶59-60. Noller and Pasquesi called Plaintiff on the evening of October 22, 2023 to notify her that Foley was rescinding its offer to her. SF ¶62.

**V.**     <u>**Plaintiff Continues to Exercise Poor Judgment After Foley's Rescinds Her Offer**</u>

Following Foley's decision to rescind its offer of employment to Plaintiff, Plaintiff spoke publicly at a City of Chicago Committee on Health and Human Relations ("CHHR") meeting on December 18, 2023. SF ¶63. Plaintiff talked about Foley rescinding its offer to her, and she stated, "my only regret is that I did not say 'from the river to the sea' in my speech [to City Council on October 11, 2023]."[3] *Id.* ¶64. While publicly reposting a news video about Foley's de, Plaintiff directed her Instagram followers to "tag and spam @foleyandlardner in the comments of the video." *Id.* ¶65. In or around January 2024, Plaintiff collaborated with SJP Chicago on a public Instagram post that directed individuals to call and email Noller and Pasquesi, providing both Noller and Pasquesi's phone numbers and email addresses in addition to a script to use for the correspondence. *Id.* ¶66.

<u>**ARGUMENT**</u>

Summary judgment is appropriate where there exists "no genuine issue as to any material

---

[3] Plaintiff acknowledged during her deposition that some people find the referenced statement divisive and offensive. SOF ¶64, n.4.

facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In ruling on a motion for summary judgment, the Court reviews the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Kotaska v. Fed. Express Corp.,* 966 F.3d 624, 628 (7th Cir. 2020). "But before the nonmoving party 'can benefit from a favorable view of evidence, [she] must first actually place evidence before the courts.'" *Stermer v. Caterpillar Inc.*, 102 F. Supp. 3d 959, 964 (N.D. Ill. 2015) (Norgle, J.) (quoting *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010)). "Simply showing that there is 'some metaphysical doubt as to the material facts'" will not defeat a motion for summary judgment." *Id.* (quoting *Matsushita Elec.*, 475 U.S. at 586); *see also Kotaska,* 966 F.3d 624 at 628. "Conclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016); *see also Kotaska,* 966 F.3d 624 at 628 (plaintiff "cannot stave off summary judgment with speculation").

## I.        PLAINTIFF'S DISCRIMINATION CLAIMS FAIL AS A MATTER OF LAW

There is no dispute about Plaintiff's public activity from October 7 to October 11, 2023, and there is no dispute about how Foley reasonably interpreted that public activity and Plaintiff's reaction when asked about it. The evidence shows that Foley extended two job offers to Plaintiff with full awareness of her identities and relevant associations—and that the only material thing that changed between its second offer to her and its decision to rescind that second offer was Plaintiff's public activity on the day of, and days that followed, the Hamas terrorist attack.

Plaintiff's claim that Foley discriminated against her on the basis of her ethnicity, religion, and association fails as a matter of law under both the *McDonnell Douglas* framework and the *Ortiz* Reasonable Factfinder method.[4] Under the *McDonnell Douglas* framework, to

---

[4] While Plaintiff alleged discrimination on the basis of ethnicity, religion, and association under both Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act, "[t]he analytical framework for [the IHRA and Title VII] is 'essentially identical,' and therefore [they] need not [be] analyze[d]

establish a *prima facie* case of discrimination, Plaintiff must prove that: (1) she is a member of a protected class; (2) she was meeting Foley's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) another similarly-situated employee outside of her protected classes and associations was treated more favorably than her. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021).

Plaintiff cannot establish even a *prima facie* case of discrimination because she cannot show that she was meeting Foley's legitimate expectations, nor can she show that Foley treated similarly situated employees who did not share her protected characteristics or associations more favorably than her. Even if Plaintiff could establish a *prima facie* case, Foley can plainly show that it had legitimate, nondiscriminatory reasons for rescinding its offer to Plaintiff, and there is no evidence that Foley's actions were a pretext for discrimination. Similarly, under the *Ortiz* framework, no reasonable factfinder could conclude that Plaintiff's ethnicity, religion, or association(s) caused Foley to take any adverse action against her. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

A. **Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination.**

1. **Plaintiff was not meeting Foley's legitimate expectations.**

As a prestigious, global law firm, Foley relies on its attorneys to exercise good judgment and to serve as good stewards of the firm in all forums. An attorney making public remarks must understand that others may interpret their words as a reflection on Foley. When Plaintiff posted publicly on social media just hours after the Hamas terrorist attack that Palestine had the right to defend itself "by any means necessary," she was not meeting Foley's legitimate expectations. When Plaintiff excused the Hamas terrorist attack as a "natural response" and a "legal right" during a public speech at the Chicago City Council meeting on October 11, 2023, she was not

---

separately." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 82, 196 L. Ed. 2d 36 (2016).

meeting Foley's legitimate expectations. When Noller and Pasquesi walked out of their meeting with Plaintiff with the impression that Plaintiff condoned the Hamas terrorist attack on Israel, Plaintiff was not meeting Foley's legitimate expectations. As Doogal testified, Foley "questioned [Plaintiff's] judgment" based on her public statements and her reaction when asked about them. SF ¶60. He continued, noting that "[j]udgment is a key component of our jobs." *Id.*

When asked what she understood had happened when she posted the "by any means necessary message" on October 7, Plaintiff testified: "I didn't know the full extent of what happened, but I knew that the people in Gaza had broken the fence or the wall that strides Gaza and the open air prison." SF ¶38. By her own telling, Plaintiff elected to take a provocative, public stance on a terrorist attack that was still unfolding without first gathering all of facts about what had happened. In doing so, Plaintiff exercised poor judgment by any measure.[5]

Plaintiff cannot establish a *prima facie* case of discrimination because her actions on or around October 7, 2023, and reaction when asked about them, showed poor judgment and did not meet Foley's legitimate expectations. As Plaintiff herself noted, she did not think she did anything wrong and still does not today. *See McCracken v. U Chicago Argonne LLC*, No. 11 C 8112, 2013 WL 5168569, at *9 (N.D. Ill. Sept. 13, 2013); *see also Finger v. Orkin, Inc.*, No. 08 C 0424, 2009 WL 102982, at *6 (N.D. Ill. Jan. 15, 2009).

### 2. Foley did not treat any similarly-situated individuals outside of Plaintiff's protected classes or associations better than Plaintiff.

Under the fourth prong of the *prima facie* case, Plaintiff must show that she was "treated less favorably than a similarly situated employee outside [her] protected class." *Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th Cir. 2022). While the comparator "need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects."

---

[5] Foley notes that Plaintiff exercised further poor judgment by omitting her leadership roles in SJP—and only those roles—from the first resume that she submitted to Foley and by omitting her leadership role in LSJP from the Conflicts Disclosure Form that she submitted to Foley.

*Reives*, 29 F.4th at 892 (internal quotations omitted). "Typically, when identifying similarly situated employees, a plaintiff 'must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them'." *Rongere v. City of Rockford*, 99 F.4th 1095, 1103 (7th Cir. 2024) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012)).

There is no evidence that any similarly-situated employee outside of Plaintiff's protected classes or associations was treated more favorably than Plaintiff. Plaintiff tries to paint several Foley partners who posted support for Israel on social media as comparators (*see* ECF No. 11 at ¶57), but they are not appropriate comparators because of their positions at Foley and because of their reactions when confronted about their social media posts.[6] It is axiomatic that an incoming first-year associate is not similarly situated to partners of the law firm. Partners are not even employees of the firm—they are owners. *See Burke v. Friedman*, 556 F.2d 867, 869 (7th Cir. 1977). Moreover, the evidence shows that when Foley became aware of concerns about the identified partners' social media posts, a member of Foley leadership addressed the issue with each partner, and each thereafter voluntarily removed the posts at issue.[7] SF ¶¶69-72. No reasonable fact finder can conclude they are proper comparators.

There is no "double standard," as Plaintiff has alleged throughout this litigation. Foley rescinded its offer to her based on what she said, how she said it, when she said it, and how she reacted when asked about it. There is no evidence that any similarly-situated employee who did not share Plaintiff's protected classes or associations was treated differently, and none was.

---

[6] For purposes of this Motion only, Foley does not challenge the comparability of the contents of the messages.

[7] In discovery, it was further revealed that two Foley associates raised concerns about social media posts by a Special Counsel in Foley's Jacksonville Office in December 2023. SOF ¶72. After the former Managing Partner of the Jacksonville Office spoke with the Special Counsel, the Special Counsel voluntarily resigned his employment at Foley, *Id.*, so while not a partner, the Special Counsel is an inapt comparator as well.

### B.     Plaintiff's Associational Discrimination Claim Fails for Additional Reasons.

Plaintiff has not stated a cognizable claim of associational discrimination based on national origin. Plaintiff alleges that Foley discriminated against her based on her "association with Palestinians as well as with organizations seeking to promote the interests of Palestinians." ECF No. 11, ¶ 66. Plaintiff does identify any particular Palestinian person with whom she associates and which association allegedly caused Foley to rescind its offer to her. Instead, she aims to sweep her alliance with—and activism for—a particular cause within the ambit of national origin discrimination. But the law does not stretch that far. In *Cortezano v. Salin Bank & Tr. Co.*, the Court affirmed summary judgment for the employer on plaintiff's associational discrimination claim (husband's national origin), holding that "national origin discrimination as defined in Title VII encompasses discrimination based on one's ancestry, but not discrimination based on citizenship or immigration status." 680 F.3d 936, 940 (7th Cir. 2012). In light of *Cortezano*, Plaintiff's suggestion that national origin discrimination captures activism or affiliation with activist organizations stretches the statute too far.

Moreover, there is no evidence in the record that Foley took any action against Plaintiff because of her affiliation with any Palestinian person or organization promoting "the interests of Palestinians," as she alleges. In fact, just the opposite. On the day Foley first became aware of Plaintiff's troubling public statements, Jaspan's first reaction was that "[a] pro-Palestinian stance itself is not a problem in [his] mind." SF ¶35. As to Plaintiff's claims regarding SJP, every single Foley deponent who was asked whether membership in SJP was disqualifying from employment at Foley testified, unequivocally, that it was not. SF ¶67. The evidence shows that Foley's interest in Plaintiff's affiliations with SJP stemmed from the fact that, as Plaintiff conceded during her deposition, Plaintiff intentionally omitted her leadership roles in SJP—and *only* her leadership roles in SJP—from the first resume that she submitted to Foley. *Id.* ¶¶10, 23. Foley was understandably curious about Plaintiff's obvious concealment of her leadership roles in SJP.

Because Plaintiff has adduced no evidence that any similarly-situated employee outside of her protected classes or associations engaged in comparable conduct to her and was treated more favorably than her, she cannot establish a *prima facie* case of discrimination.

### C.    Plaintiff Cannot Establish Pretext.

The evidence plainly supports that Foley rescinded its offer to Plaintiff for legitimate, non-discriminatory reasons; namely, Foley reasonably interpreted Plaintiff's public social media posts and City Hall remarks on or around October 7, 2023 as condoning the Hamas terrorist attack, Foley believed Plaintiff exercised poor judgment in making the remarks, and Noller and Pasquesi left the meeting with Plaintiff with the impression that she condoned the attacks.

If Plaintiff could establish a *prima facie* case, which she cannot, her claim would still fail because she cannot put forward any evidence that Foley's stated rationale for rescinding its offer to her is a pretext for discrimination. To prove pretext, Plaintiff must show that Foley lied about its legitimate, non-discriminatory reasons for rescinding its offer to her. *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 824 (7th Cir. 2006). Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). Plaintiff has put forward no evidence that Foley lied about its reasons for rescinding her offer of employment. Foley has been clear and consistent in its reasoning since it rescinded her offer. SF ¶¶59-60. Foley did not make the decision to rescind Plaintiff's offer lightly—it grappled with the issue for almost a week. After giving Plaintiff an opportunity to respond to its concerns, Foley decided to rescind Plaintiff's offer because it adjudged that her conduct violated its core values. No reasonable fact finder can conclude this was not the real reason for Foley's actions. Foley stands by its difficult decision.

### <u>CONCLUSION</u>

WHEREFORE, Foley respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiff's claims in their entirety.

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on April 9, 2025, the foregoing **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

*/s/ Tracy M. Billows*
Tracy M. Billows
