IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JINAN CHEHADE, ) | |
| ) | Case No. 24-cv-04414 |
| Plaintiff, ) | |
| ) | Judge Sharon Johnson Coleman |
| v. ) | |
| ) | |
| FOLEY & LARDNER, LLP, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jinan Chehade ("Chehade") brings this action against Foley & Lardner, LLP ("Foley") under Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act.[1] Chehade, a Muslim woman of Arab descent, alleges that Foley discriminated against her when it rescinded her offer of employment. She brings her claims amidst tensions between the right to practice law and the principle of free speech, which profoundly intensified in the wake of the October 7, 2023 attacks by Hamas in Israel. Chehade is one of many lawyers who faced career consequences for speaking out about the violence in Gaza. In her case, she claims that her race and religion were the deciding factors for Foley in determining that she would face those consequences.

Presently before the Court is Foley's motion for summary judgment [64]. For the following reasons, the Court denies Foley's motion.

---

[1] The analytical framework for Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act "is essentially identical" and therefore "[they] need not [be] analyze[d] separately." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 82, 196 L. Ed. 2d 36 (2016).

1

**I.     Rule 56.1 Statements**

   *A. Compliance with Local Rule 56.1*

Local Rule ("LR") 56.1(a)(2) requires a party moving for summary judgment to file a statement of material facts with citations to the record, attaching the cited evidence. LR 56.1(b)(2) requires the opposing party to file a response attaching "any cited evidentiary materials not attached" to the moving party's statement. The responding party must admit, dispute, or admit in part and dispute in part each asserted fact. LR 56.1(e)(2). To assert new facts, the nonmoving party may file a statement of additional material facts, attaching any cited evidentiary material not yet in the record. LR 56.1(b)(3).

The Court need not list each instance of deficiency in the parties' LR 56.1 statements, but underscores that the credibility and weight of witness testimony are questions reserved for a jury. Where a party disputes a fact by claiming that testimony is not "credible" or fails to cite supporting evidence to dispute a proposed fact, that fact is deemed admitted. The Court may rely on such facts to the extent supported by the record.

   *B. Evidentiary Objections*

Foley argues that many of Chehade's asserted facts are premised on inadmissible hearsay and should not be considered at summary judgment. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). Generally, hearsay is inadmissible absent some exception. Fed. R. Evid. 802. Statements offered against an opposing party are definitionally not hearsay if made by a party's "employee" about a matter within the scope of employment, as long as the declarant was an employee when she made the statement. Fed. R. Evid. 801(d)(2)(D). In cases involving adverse employment actions, an employee need not have been personally involved in the action, but her duties must encompass some responsibility related to "the decisionmaking process affecting the employment action." *Simple v. Walgreen Co.,* 511 F.3d 668, 672 (7th Cir. 2007).

2

Chehade's statement of additional facts cites a series of handwritten notes taken by Jennifer Patton, Foley's Chief Talent Officer at the time. In that role, Patton had significant involvement in employment decisions. She testified that she "oversaw a team … across a range of functions from legal recruiting to professional development; diversity, equity, and inclusion; Human Resources; attorney coaching; and compensation and benefits." When "personnel issues" arose, she had "conversations" with "firm leaders" as to "the best course of action." Moreover, Patton was in the room and part of the conversation when Foley decided to rescind Chehade's offer. Accordingly, Patton's notes are statements of an employee made on a matter within the scope of her employment. To the extent Patton's notes reflect statements of others, those notes are still admissible. "Hearsay within hearsay is not excluded" if "each part of the combined statements conforms with an exception" to the rule against hearsay. Fed. R. Evid. 805. Patton's record of others' statements may be offered for the nonhearsay purpose of showing their effect on Foley's decisionmaking. *See Boutros v. Avis Rent A Car Sys., LLC*, 802 F.3d 918, 924 (7th Cir. 2015) (out-of-court statements were admissible when presented as evidence of employer's reasons for suspending and firing plaintiff). Therefore, Patton's notes may be considered for the purpose of summary judgment.

Next, Chehade offers statements from Foley partner Shabbi Khan that he seemed "genuinely surprised" that Chehade's offer was revoked, and that he "hope[d] [she would win her] case." It is unnecessary to determine whether Khan's statements are admissible under hearsay rules. The Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of … confusing the issues" or "misleading the jury." Fed. R. Evid. 403. Khan admittedly had little insight into the decision to revoke Chehade's employment and was uninvolved in the process. Any probative value of his statements is outweighed by the danger that a jury would give deference to Khan's senior position. The Court will not consider them in resolving Foley's motion for summary judgment.

Finally, Foley objects to statements made by Arab American associates at the firm. Individual associates stated they felt fearful and unsafe after the firm revoked Chehade's offer. An associate also claimed Foley gave a false impression that Muslim lawyers approved the action, and that Foley had a "double standard" when it came to statements about Israel and Palestine. An out-of-court statement describing the declarant's "then-existing … emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" is not excluded by the rule against hearsay. Fed. R. Evid. 803(3). However, a statement of belief offered "to prove the fact … believed" does not fall within the exception. *Id.* Chehade may not offer statements of Arab American associates to prove that Foley did in fact employ a double standard and only consulted a single Muslim partner. The Court will only consider statements from Arab American associates offered to show their fearful emotional state.

Having determined which facts may be relied upon for summary judgment, the Court next turns to the undisputed factual background.

## II. Facts

### A. Foley Hires Chehade

Chehade is a first-generation Muslim Arab woman from Bridgeview, Illinois, colloquially known as "Little Palestine." She is a graduate of DePaul University and Georgetown University Law Center ("GULC"), where she received her Juris Doctorate.

In August 2021, Foley interviewed Chehade for a Summer Associate position through the On-Campus Interview ("OCI") program at GULC. On her resume, Chehade listed her memberships in the Muslim Law Students Association and the Arab Law Students Association, and her leadership role in the Muslim Students Association at DePaul. She was also the President of Students for Justice in Palestine ("SJP") DePaul, cofounder and President of SJP Chicago, and cofounder of Law Students for Justice in Palestine ("LSJP") at GULC. She did not list the latter involvements on the resume she submitted for the OCI program but did tell her interviewers that she grew up in "Little Palestine."

4

She discussed her experience growing up in a "predominantly Muslim and Arab community" and how that impacted her after the attacks on September 11, 2001, "when Muslims were demonized and scrutinized for our background." Chehade also applied to Foley's Diversity Fellowship Program for Summer Associates. In the personal statement she submitted with her application, Chehade described herself as a "visible Muslim Arab-American first-generation woman with a physical disability," and recounted when her father's car was vandalized with the word "TERRORIST."

Foley recruited Chehade for a summer associate position in its Chicago office. She completed the program in the summer of 2022 without incident. At the end of the summer, Foley offered Chehade a full-time associate position to begin after she graduated law school. She accepted the offer.

B. *Chehade's Public Statements Regarding October 7, 2023*

A year later, on October 7, 2023, Hamas launched a deadly attack on Israel. Over 1,200 people were killed and approximately 250 were taken hostage. The same day, Chehade shared this message on social media:

"As you see Palestine in the news, keep two things in mind:

1. Colonization is inherently violent. Occupation is violent. Israel's existence was brought about by violence. Never equate the violence of the oppressed with that of the oppressor. The colonized with the colonizer.

2. If you support Palestine understand that necessitates supporting our right to defend ourselves and liberate our homeland by any means necessary. The colonizing power determined what was necessary when they colonized us by force and continue to genocide Palestine. You cannot claim to stand with Palestine if you prefer us to be slaughtered without fighting back. Freedom has only ever been achieved through resistance.

#FreePalestine #WithinOurLifetime"

Chehade made further remarks at a public meeting of the Chicago City Council on October 11, 2023. At the City Council meeting, Chehade opposed a resolution condemning the Hamas attack, which she explained was "completely one-sided and made no mention of Palestinians." She said:

"The Western Zionist controlled media machine would have you believe that this was an unprovoked attack. However, this is the natural response to 75 years of occupation, such that

this resistance is a legal right for the Palestinian people according to international law… I'm sorry the people of Gaza did not sit quietly."

Chehade was scheduled to start her position at Foley on October 23, 2023. The week before, on October 16, a Legal Recruiting Assistant at Foley named Ayesha Karim searched for Chehade online. She claimed that she needed to find a photo of Chehade for Foley's "2023 New Associate Directory." Karim came across Chehade's statements and brought them to the attention of Amy Moynihan, Foley's Director of Legal Recruiting. Later that day, Moynihan wrote to a group including Foley's Chairman and CEO, Daljit Doogal; former Managing Partner, Stanley Jaspan; Chair of Foley's National Recruiting Committee, Robert Scher; and Chief Talent Officer, Jennifer Patton. Moynihan told them that Chehade, an incoming associate, "shared content on her public Instagram account that demonstrates her support and advocacy for the Palestinian stance during the Israel-Palestine conflict." Moynihan, Patton, and Scher said they did not feel it was "appropriate" to take any action against Chehade. Doogal and Jaspan responded that "more information would be good" and that it would be "helpful to know the nature of her statements." Jaspan clarified that a "pro-Palestinian stance itself [was] not a problem in [his] mind" as to Chehade's employment at Foley.

C. *Foley Decides to Rescind Chehade's Employment Offer*

Over the following days, Foley continued its inquiry into Chehade's activism. Foley investigated Chehade's roles in SJP and LSJP, which she included on the updated resume she sent to Foley but not on her conflict disclosure form. Moynihan circulated Chehade's statements to Foley leadership via e-mail, noting that Chehade "[did] not come out and say that she supports the attacks on Israel." Managing Partner Jaspan further responded to the full group of Foley leaders with comments such as "'75 years of occupation' and 'liberate our homeland' literally means (and is intended to mean) wiping out <u>in its entirety</u> the State of Israel and throwing out (or killing all) the Jews who are there" (emphasis in original) and that "[Chehade] is clearly defending the actions of Hamas." He separately sent Moynihan an op-ed titled "Don't Hire My Anti-Semitic Law Students."

Moynihan personally described that Chehade is "a vocal and active supporter of the Palestinian movement," that she "seems to encourage and advocate for others to resist and not through peaceful means," and that she "does not appear to be sympathetic to the loss of life in Israel." Despite Moynihan's strong statement, Eileen Ridley, Chief Diversity & Inclusion Partner, stated her preference was "to let [Chehade] start and have a conversation with her." Foley's Chief of Diversity, Equity, and Inclusion, Alexis Robertson, was also in favor of Chehade starting work as planned. Patton's notes from speaking with Robertson stated: "we have tolerated other harmful rhetoric in the past."

Foley changed course on October 21. That morning, Jaspan, Doogal, Phil Phillips (Foley's inside employment counsel), Lisa Noller (Foley's Litigation Department Chair), and Frank Pasquesi (Managing Partner of Foley's Chicago office) met and decided that Noller and Pasquesi would meet Chehade at Foley's office on October 22, the day before her start date. Patton prepared "Draft Talking Points" for Noller to use during the meeting with Chehade, writing that the goal was to "understand and seek clarification if [Chehade] in fact condone[d] or [was] endorsing Hamas's attack on Israel and the specific acts against the Israeli people."

At the October 22 meeting, Noller asked Chehade about her statements, her beliefs around Palestine, and her prior involvement in SJP. The conversation strayed further when Noller and Pasquesi asked Chehade to discuss her father and his employment at the Mosque Foundation in Bridgeview. Noller and Pasquesi then asked Chehade directly whether she condemned Hamas's attack. Chehade told Noller and Pasquesi that when she referenced "the natural response to 75 years of occupation" and said that "resistance is a legal right for the Palestinian people according to international law," she "was referring to the legitimacy of Palestinians to resist occupation." Noller's notes from the meeting read: "Attacks on civilians: Do not condone terrorism," and "Do not condone Hamas." After their conversation with Chehade, Noller and Pasquesi met with Doogal, Jaspan, Patton, Ridley, and Phillips to recap. Patton wrote in her notes from the "debrief" meeting: "cordial,

7

polite … doesn't condone terrorism … condemns Hamas terrorist activity … doesn't see how those words are offensive." Nevertheless, Noller stated that she left with the impression that Chehade "condoned" the violence of Hamas. Pasquesi felt Chehade was "citing to … authority" for "why the Hamas attacks were justified or acceptable."

Doogal claimed to have made the ultimate decision to rescind Chehade's employment offer. He expressed concerns about her "judgment." Based on her statements and what Noller and Pasquesi shared, Doogal believed that "[Chehade] condoned the actions of Hamas on October 7th." Noller and Pasquesi called Chehade the evening before her start date to tell her that Foley was rescinding its employment offer. Foley's internal statement announcing the decision said that Chehade's statements were "misaligned with [Foley's] core values" and that Foley "arrived at this decision in consultation with members of firm leadership, our Chief Diversity Equity and Inclusion Partner, and members of the firm of both Jewish and Muslim faith."

Foley was internally divided as to this outcome. Days later in a meeting with Jaspan, Robertson expressed disappointment in her lack of involvement as Foley's Chief of Diversity, Equity, and Inclusion. She said Jaspan explained why he "made the decision about rescinding [Chehade's] offer," and that he likened Chehade's remarks to saying something "anti-Black" or "inappropriate about, for example … a lynching." Many Arab American associates at Foley became fearful after the decision, in part because they felt it was "unsafe for them to express their views on the conflict within the firm." Doogal reiterated that Chehade's offer was revoked for supporting "the killing of innocent lives."

D. *Foley's Response to Other Statements About the October 7 Attacks*

In the weeks following the October 7 attacks, attorneys already working at Foley made statements on social media about the attacks. Max Chester, a Foley partner, shared the statement: "Individuals who committed these atrocities and those who enabled them must be liquidated as

8

enemies of the humankind. And the evil vile ideology they spew must be eradicated." Another partner, Dovi Alderstein, made a post stating:

> "Let me say this in the clearest possible terms. If you're concerned with Israel's response, if you're focused on the people of Gaza right now, you're either ignorant or intentionally hypocritical.... You're worried about the electricity and water in Gaza? You can provide it. Don't want to? Then keep your mouth shut. They have nowhere to go those poor Gazans? Why don't you go look at a map? They have a border with Egypt. Let them take them in if they care so much. They don't want them? Not my problem.... And once and for all, we need to unequivocally reject the false narrative of "They're not all Hamas supporters so Israel has no right to attack Gaza. . . . The Palestinian people elected Hamas. Make up your mind. If they're a people who you believe deserve a state then it's time you held them accountable as a people. . . . In every war in the history of the world, innocent people die. That fact, as sad as it might be, has zero relevance to whether the war is justified or not."

Foley "formed no opinion" on whether the posts were "consistent with Foley's core values." Yet Noller did not like the use of ad hominem nor use of the word "liquidated," and did not believe it consistent with Foley's core values to advocate for sending civilians to Gaza during the war. Ridley said Adlerstein's post "could potentially" implicate Foley's core values, but could not say that it violated Foley's core values for Israel to "turn[] off water and electricity to the area, the entire area" of Gaza. Neither Chester nor Adlerstein were reprimanded or disciplined for the posts, but the posts were removed. Another Foley associate, "MJ," posted pro-Palestinian social media posts under the username "catholiclawschoolgirl." Foley also did not take adverse action against MJ and instead counseled her on Foley's social media policy, which applied to all attorneys and staff at Foley.

### III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and

9

. . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted).

## IV. Discussion

When a defendant moves for summary judgment in a discrimination case, "the 'singular question' … is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the … adverse employment action.'" *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), *reh'g denied* (July 31, 2020) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). Membership in a protected class need not have been the *only* factor; an employer discriminates if it "intentionally relies in part" on the protected characteristic when it makes an adverse employment decision. *Bostock v. Clayton County*, 590 U.S. 644, 659 (2020). In other words, if changing the employee's protected characteristic "would have yielded a different choice by the employer," the action was unlawful. *Id.* at 659–60. It is undisputed that Chehade belongs to a protected class as a Muslim of Arab descent, and that Foley's revocation was an adverse employment action. Chehade does not dispute that she made the statements attributed to her. The parties dispute only that Chehade's protected class was a reason for the revocation.

### A. McDonnell Douglas and Holistic Approach

Much of Foley's analysis takes place within the *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). While *McDonnell Douglas* "is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," it is "not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d

10

216, 224 (7th Cir. 2017). Chehade's presentation relies not on *McDonnell Douglas*, but on the approach articulated by the Seventh Circuit in *Ortiz v. Werner Enterprises, Inc.* Under *Ortiz*, Plaintiffs may "prove discrimination in a holistic fashion" by presenting all direct and indirect evidence together "as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Because Chehade relies on the holistic approach, she must set forth "direct or circumstantial evidence" sufficient to "support[] an inference of intentional discrimination." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). Courts ask whether a jury may find "an overall likelihood of discrimination" without analyzing direct and circumstantial evidence separately, nor "asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 763. There are "three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).

### B. Foley's "Core Values" and Standards

The Court must note at the outset that any clear articulation of Foley's "core values" and social media policies is absent in the record. Chehade does not dispute that she made the statements attributed to her, but there is a conspicuous lack of any objective standards of conduct by which she was evaluated. Witnesses admitted that posts from other Foley attorneys calling for the collective punishment of Palestinians were not consistent with its "core values." Those attorneys were not formally admonished, let alone terminated. They were afforded the opportunity to take down their posts. There is no evidence that Foley ever asked Chehade to do the same, despite statements from Ridley that she would not object to "letting [Chehade] go" if she "wo[uld]n't take down her posts." If Foley's firmwide "core values" did not vary between personnel, there is apparent disparate treatment of those statements. If non-Arab, non-Muslim attorneys were not evaluated against the

11

same standards as Chehade for the same conduct, such that she was held to some separate, undefined standard, that could lead a juror to conclude that there was discrimination.

### C. Disparate Treatment

To further illustrate a disparity, Chehade points to social media posts from non-Muslim, non-Arab Foley lawyers about the October 7 attacks as evidence that others outside of her protected classes received better treatment. To support an inference of discrimination, comparators need not be identically positioned, but must be "'directly comparable' to a plaintiff 'in all material respects.'" *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009) (quoting *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610–11 (7th Cir. 2006)). While a partner and a first-year associate certainly differ in their experience and job duties, it is undisputed that Foley's social media policy applied to *all* attorneys at Foley. And while the adverse employment action occurred before Chehade began as a full-time associate, she was not starting on a blank slate. Foley did not decline to hire her. They offered her a job after her performance as a summer associate, and she accepted. After that, she was held to the standards of a Foley attorney, as clear from the basis Foley gave for its revocation.

Moreover, the undisputed facts show that "MJ" also made pro-Palestine social media posts but was merely counseled on Foley's social media policy. It is a reasonable inference from MJ's username, "catholiclawschoolgirl," that she is not Muslim, and therefore is outside of at least one of Chehade's protected classes. While the decisionmaking process is less developed in the record with respect to MJ, a disparate outcome (coupled with a lack of explanation as to why MJ was not disciplined) could support an inference of discrimination against Chehade. It is the role of a jury to consider the nature of MJ's social media posts as well as any evidence of "differentiating or mitigating circumstances as would distinguish … [Foley's] treatment" of MJ, *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (internal quotations omitted), and to make the ultimate determination.

Finally, Chehade asserts there is evidence showing that the search of her social media itself was disparate treatment. Ayesha Karim, the Legal Recruiting Assistant who discovered Chehade's statements about the October 7 attacks, claimed that she searched Chehade online because Chehade had yet to submit a photo and biography for Foley's incoming associate directory. Chehade testified that she had by that time uploaded her photo (in which she wore a hijab) and biography (in which she states she is from "Little Palestine"). Her claim is that it was her apparent race and religion that prompted Karim to search her social media. On the one hand, a jury could disbelieve Foley's justification based on evidence that Chehade had already uploaded her photo and biography (and, in any event, Foley already had a photo of her from the prior summer) and searching associates' social media was highly unusual. A jury could also conclude that Karim searched Chehade's social media after learning of Chehade's background when considering real-life context: Chehade submitted her biography describing her upbringing in "Little Palestine" just days after the October 7 attacks, when the social media activity of law firm associates was heavily scrutinized. On the other hand, a jury could accept Foley's account that Karim had simply not seen Chehade's submission and searched Chehade only to find a photo for its directory. Deciding which scenario is likelier is the quintessential role of the trier of fact.

### D. *Pretext*

Chehade next asserts that Foley's reason for rescinding her offer is pretextual. Pretext is a "dishonest explanation, a lie rather than an oddity or an error." *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024). Proving pretext requires "identify[ing] such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 914 (7th Cir. 2025) (internal citation omitted). It is permissible for the trier of fact "to infer the ultimate fact of discrimination

13

from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000) (citation omitted).

Foley does not aver that Chehade's job performance was poor, but that she "showed poor judgment" based on "her public statements and her reaction when asked about them." Chehade affirmatively told Noller and Pasquesi that she did not condone violence and that she condemned terrorism. Noller and Pasquesi still felt she condoned the attacks and that she attempted to justify them. In Noller's view, Chehade did not "distance herself or apologize or express any empathy from the October 7 attacks." A trier of fact must adjudge the sincerity of the opinion that Chehade condoned terrorism, and whether the expectation that Chehade "distance herself or apologize or express any empathy" was legitimate, or unfairly imposed given anti-Muslim, anti-Arab stereotypes. A reasonable juror could find an "inconsistency" or "contradiction" in Foley's reasoning.

Further, even if Noller and Pasquesi did not themselves raise the topic of Chehade's father (a point of dispute), they pursued the line of questioning about Chehade's background rather than redirecting the conversation back to her conduct. Evidence about interview questions asked in the course of making an employment decision "does not require, but certainly permits, an inference that the decision-makers were indulging … stereotypes." *Joll*, 953 F.3d at 930. Questions about Chehade's father and his work fall well outside the four corners of her statements. A jury may find that such questions reflect a focus on Chehade's race and religion. These issues cannot be resolved at summary judgment; a trier of fact must decide which interpretation of the record is correct.

The record is indecisive as to who made the ultimate decision to revoke Chehade's employment offer—Doogal or Jaspan. There is an issue either way as to whether their justifications were pretextual. Again, there is a dispute as to whether Foley believed Chehade condoned violence based on her answers. A jury must also evaluate whether Jaspan in fact advocated behind-the-scenes to revoke her employment offer based on his involvement in the decisionmaking process and his

14

comment about why he "made the decision about rescinding [Chehade's] offer." If a jury interpreted Jaspan's statement that Chehade supported the "killing" and "throwing out" of *all* Jewish people in Israel reflects stereotypes about Muslims and Arab Americans being inherently violent, that evidence could also support an inference of discriminatory intent.

Finally, "'behavior toward or comments directed at other employees in the protected group'" is "circumstantial evidence that can support an inference of discrimination." *Vega v. Chicago Park District*, 954 F.3d 996, 1005 (7th Cir. 2020) (quoting *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008)). The widespread fear felt by Arab American associates after the October 7 attacks and Foley's revoking Chehade's offer, along with comments that all Palestinians must be "held accountable" and reflecting stereotypes about Muslims or Arabs being violent, could support a finding that the environment at Foley was inhospitable. And a jury could infer based on that determination that such stereotypes impermissibly influenced Foley's decision.

## V. Conclusion

It was clear at the outset that this case is rife with issues of material fact. But given the importance and sensitive nature of these matters, a comprehensive explanation was due. If the factual disputes described in this opinion are resolved in favor of Chehade, a jury could reasonably conclude that Chehade's membership in a protected class caused her employment offer to be rescinded. *See Ortiz*, 834 F.3d at 766.

The essence of a discrimination case is that employers rarely admit an unlawful motivation for terminating an employee. If a lack of evidence that an employer explicitly announced discriminatory intent was sufficient to win summary judgment, plaintiffs would rarely prevail. But where there is circumstantial evidence of discrimination, the legitimacy of the employer's explanation is put to the test. That is a task properly reserved for a jury, not the Court. For that reason, summary judgment is inappropriate, and the Court must deny Foley's motion.

**IT IS SO ORDERED.**

Date: 1/26/2026

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge